**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS**

**DOCKET NO.**


**GREG BEECHE LOGISTICS, LLC**
Plaintiff

**vs.**

**SKANSKA USA BUILDING, INC.,
WING INC. SPECIALTY TRADES,**
and
**RON MULCAHEY**
Individually and as Trustee
Defendants


**<u>VERIFIED COMPLAINT</u>**

**INTRODUCTION:**

      This is an action brought by the designer, manufacturer and lessor of a scaffolding system

to recover rental fees, related charges, and damages arising out of the use of the system for the

renovation of the Secretariat Building at United Nations Headquarters in New York City.

      The claims assert contract, tort and statutory remedies under the laws of the State of New

York, the Commonwealth of Massachusetts, and the United States. One of the counts is brought

under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et*

*seq.*

[The length of the Complaint is dictated by the heightened pleading requirements of
Fed.R.Civ.P. Rule 9(b) re intentional misrepresentation claims, RICO claims, and choice of law
issues.]

# TABLE OF CONTENTS:

The Parties..................................................................................................... 3
Jurisdiction and Venue.................................................................................. 5
Substantive Allegations................................................................................. 5
  A. The Immunity of the United Nations.................................................... 5
  B. The UN Project.................................................................................... 7
    (1) UN/Skanska Agreement............................................................... 7
    (2) Introduction of Project to Beeche Logistics.............................. 9
    (3) Skanska/Wing Agreement......................................................... 19
    (4) Wing/Beeche Logistics Agreement........................................... 20
    (5) Contract Performance............................................................... 28
      (a) Contract Change Proposal 01.1............................................ 30
      (b) Contract Change Proposal 01.3............................................ 34
      (c) Contract Change Proposal 01.4............................................ 35
      (d) Contract Change Proposal 01.5............................................ 38
      (e) Contract Change Proposal 002.1.......................................... 43
      (f) Contract Change Proposal 003.1........................................... 44
      (g) Contract Change Proposal 004.1.......................................... 46
      (h) Contract Change Proposals 005.1 and 006.1........................ 47
      (i) Additional Quadrant Moves.................................................. 56
      (j) Contract Change Proposal 007.1........................................... 57
      (k) Additional Rental.................................................................. 61
      (l) Removal of Scaffold Systems from Structure........................ 63
      (m) Contract Change Proposals 008.1 and 009.1....................... 69
COUNT I (Breach of Contract - New York Law - Wing/Skanska)..................... 74
COUNT II (Unjust Enrichment - New York Law - Wing/Skanska).................... 74
COUNT III (Promissory Estoppel - New York Law - Wing/Skanska)................ 76
COUNT IV (Intentional Misrepresentation - New York Law - Wing/Skanska) . 77
COUNT V (Intentional Misrepresentation - Mass. Law - Wing)........................ 79
COUNT VI (G.L. c.93A - Mass. - Wing/Skanska)............................................ 82
COUNT VII (Negligent Misrepresentation - New York Law - Wing/Skanska)... 85
COUNT VIII (Negligent Misrepresentation - Mass. Law - Wing)...................... 86
COUNT IX (Third Party Beneficiary - New York Law - Wing/Skanska)............ 88
COUNT X (New York Lien Law - Wing/Mulcahey) ............................................ 89
COUNT XI (Breach of Trust - New York Law - Wing) ..................................... 90
COUNT XII (RICO - Wing/Skanska/Mulcahey)............................................... 91
PRAYERS FOR RELIEF.................................................................................. 95

**THE PARTIES:**

1.)     The plaintiff Greg Beeche Logistics, LLC (hereinafter "Beeche Logistics") is a limited

liability company duly organized and existing under the laws of the State of New York

with a principal place of business in the Town of Waterford, New York.

2.)     Beeche Logistics and/or its Chief Executive Officer Greg Beeche have for nearly forty

years designed, manufactured, sold and/or leased customized scaffold systems for use in

the United States, Latin America and Europe for the erection, renovation and/or

demolition of large commercial structures including, but not limited to, high rise office

and residential towers. Beeche Logistics has engaged in construction projects in interstate

commerce and within in the Commonwealth of Massachusetts.

3.)     The defendant Skanska USA Building, Inc. (hereinafter "Skanska") is a corporation duly

organized and existing under the laws of the State of Delaware with a principal place of

business in the City of Parsippany, New Jersey. At all times material hereto Skanska has

been engaged in interstate commerce and registered as a foreign corporation doing

business within the Commonwealth of Massachusetts.

4.)     Skanska and its affiliated companies constitute one of the largest construction companies

in the world. Skanska has erected, renovated and/or demolished large commercial

structures including, but not limited to, high rise office and residential towers. Skanska

has engaged in construction projects within the Commonwealth of Massachusetts. *See,*

*e.g.*, Skanska USA Building, Inc. v. The Hartford Roofing Company, Inc., *et al*, United

States District Court, C.A. No. 04-cv-12538 DPW (Mass.)

5.)     The defendant Wing Inc. Specialty Trades (hereinafter "Wing") is a corporation duly

        organized and existing under the laws of the State of Georgia since October 11, 2006. It

        registered as a foreign corporation doing business in the Commonwealth of

        Massachusetts on November 8, 2006 listing its principal place of business as 1715 Trellis

        Place, Alpharetta, Georgia, and its President Ron Mulcahey as residing at 4 Kenilworth

        Street, Andover, Ma., with the Massachusetts office of Wing at the same address. On

        February 25, 2010 Wing entered into a Standard Form of Agreement Between Contractor

        and Subcontractor with Beeche Logistics listing Wing's address as 444 Washington

        Street, Woburn, Massachusetts.

6.)     At all times material hereto Wing engaged in commerce within the Commonwealth of

        Massachusetts and interstate commerce and provided demolition and asbestos abatement

        services on commercial projects. Wing is a "trustee" for the benefit of Beeche Logistics

        under New York Lien Law Art. 3A §70 to the extent that Wing has received or is due to

        receive payments from Skanska under the United Nations Secretariat Project described

        hereinafter

7.)     The defendant Ron Mulcahey ("Mulcahey")is a resident of Andover, Massachusetts, and

        citizen of the Commonwealth of Massachusetts. At all times material hereto he was the

        owner, President, Treasurer and Secretary of the defendant Wing. As such, he was and is

        a "trustee" for the benefit of Beeche Logistics under New York Lien Law Art. 3A §70 to

        the extent that Wing has received or is due to receive payments from Skanska under the

        United Nations Secretariat Project described hereinafter.

8.)     The defendant Mulcahey is liable personally and as trustee to Beeche Logistics for all

wrongfully diverted trust proceeds as defined under New York Lien Law.

## JURISDICTION AND VENUE:

9.)     This action is brought pursuant to the grant of diversity jurisdiction contained in Section

1332 of Title 28 of the United States Code. There is complete diversity of citizenship

among the plaintiff and the defendants, and the matter in controversy is valued in excess

of $100,000. This action is also subject to the grant of federal question jurisdiction

contained in Section 1331 of Title 28 of the United States Code. This action is also

subject to the grant of special jurisdiction contained in Section 1964(c) of Title 18 of the

United States Code. State law claims are subject to the grant of pendent and ancillary

jurisdiction contained in Section 1367 of Title 28 of the United States Code.

10.)    Venue is appropriate for the Eastern Division of the District of Massachusetts pursuant to

18 U.S.C. §1965(a) because the principal place of business of the defendant Wing and the

residence of the defendant Mulcahey are located in the Eastern Division.

## SUBSTANTIVE ALLEGATIONS:

A.      The Immunity of the United Nations:

11.)    The United Nations is a creature of the Charter of the United Nations, June 26, 1945, 59

Stat. 1031. The UN Charter provides that the UN "shall enjoy in the territory of each of

its Members such privileges and immunities as are necessary for the fulfillment of its

purposes." UN Charter, art. 105 §1. It is the subject of the Convention on Privileges and

Immunities of the United Nations ("General Convention"), 21 U.S.T. 1418, 1 U.N.T.S.

16 (Feb. 13, 1946) The Convention provides that "[t]he United Nations, its property and

assets wherever located and by whomsoever held, shall enjoy immunity from every form

of legal process except insofar as in any particular case it has expressly waived its immunity." General Convention, art. II §2; <u>Brzak v. United Nations</u>, 597 F.3d 107, 112 (2nd Cir. 2010) The United States is a party to both treaties. <u>Askir v. Boutros-Ghalis</u>, 933 F.Supp. 368, 371 (S.D.N.Y. 1996)

12.)    The UN immunity is unlike the immunity provided to foreign embassies that are subject to the "commercial exception." By treaties and under international law, foreign embassies that enter into contracts for the provision of labor and materials to the embassies are not immune from process. The inapplicability of the "commercial exception" to the UN is not generally known to contractors such as Beeche Logistics and legal practitioners providing services to contractors such as Beeche Logistics.

13.)    At all times material hereto the inapplicability of the "commercial exception" to the UN was known to Skanska, Mulcahey and Wing.

14.)    At no time prior to November of 2012 was Beeche Logistics advised by anyone, including but not limited to Skanska, Mulcahey and Wing, that the real and personal property of the United Nations was immune to process and/or liens imposed under the Lien Law of the State of New York, Art. 3-A.

15.)    At no time prior to November of 2012 was Beeche Logistics aware that the property of the United Nations was immune to process and/or the Lien Law of the State of New York, Art. 3-A.

16.)    The immunity of the United Nations to commercial claims for providers of labor and materials to the United Nations was "material" information to Beeche Logistics with regard to its decision to provide labor and materials to the UN Project.

        B.      <u>The UN Project</u>:

(1)     UN/Skanska Agreement

17.)    The United Nations as "Owner" decided to renovate the Secretariat Building at United

Nations Headquarters in New York City. The project involved, in part, the removal of

curtain wall, glass, asbestos and lead paint during the demolition phase of the renovation.

In July of 2007 the United Nations entered into a PrecPreconstructionPreconstruction Services Agreement

with Skanska. The purpose of the Agreement was, in part, to obtain estimates from

various contractors and develop a budget for construction. Thereafter, the United Nations

as "Owner" entered into a Construction Management Agreement with Guaranteed

Maximum Price and Construction Manager Acting as Constructor and Holding Trade

Contracts (hereinafter "Management Agreement") with Skanska as "Construction

Manager."

18.)    Skanska guaranteed to the United Nations that the cost of the project would not exceed a

maximum price. The United Nations was not required to pay more that the maximum

price to Skanska unless the United Nations expressly agreed with Skanska to do so.

19.)    As guarantor of the maximum price, Skanska had a financial interest in not paying

claims for labor and materials that fell outside the scope of the trade agreements that

Skanska entered into as Construction Manager with third parties to perform the work -

unless the United Nations agreed to pay Skanska for such claims.

20.)    Article 1.1.1 of the Management Agreement provided that Skanska was an independent

contractor and not an employee or agent of the United Nations. Article 1.2 assigned

Skanska the responsibility of finalizing bids for the project and entering into trade

agreements with sub-contractors. Further, "[i]f Owner and Construction Manager require

posting of Trade Contractor Surety Bonds, said requirement will be included in the

Information for Bidders documents." Article 1.4.2 required the Construction Manager to

maintain a log of all disputes arising under the contract documents among the

contractors.

21.) Article 2.5 mandated that Skanska was responsible directly to the United Nations and

was to refrain from any action that might adversely affect the United Nations. Under

Article 2.5.1 Skanska was to directly negotiate with low bidders to reduce prices to

conform to budget line item expense.

22.) Article 2.7.5 provided that change orders were subject to prior approval by the United

Nations "... except for (i) such Change Orders to be funded by Construction Manager

Controlled Contingency ... and (ii) Field Orders which are allowed under Section 5.15.1

without the Owner's pre-approval."

23.) At no time was Beeche Logistics ever advised by the UN, Skanska or Wing regarding the

amount of money available in the Construction Manager Controlled Contingency Fund to

fund the payment by Skanska or Wing for extra labor and materials provided by Beeche

Logistics or the scope of a Field Order that could be issued by Skanska to authorize a

Change Order under Section 5.15.1 for the benefit of Beeche Logistics.

24.) Article 5.3 provided that all Change Orders "... shall also describe the impact to the

Contract Time, if any, occasioned by the Change Order Work."

25) Article 5.3 expressly anticipated the use of Change Orders to extend the time within

which a subcontractor such a Beeche Logistics could perform contractually obligated

labor and provide contractually obligated materials.

26.)      Article 10.5 mandated that Skanska "effectuate back charges in amounts that are equal to the damages and losses sustained by Owner to such parties as are responsible for improper performance of the provisions of its Trade Contract...."

27.)      Article 3.12.3 provided that Skanska was responsible for keeping the project free from all liens. If liens were imposed, Skanska was liable to the United Nations "... for all costs, including attorney's fees, to discharge or satisfy any such lien or claim."

28.)      Article 21.7 made Skanska responsible for resolving disputes by amicable settlement/mediation with parties with whom Skanska contracted.

29.)      On or about November 2008 Skanska issued Contract Bid Documents for the Project.

30.)      The Contract Bid Documents defined a complex multi tiered scaffold system to be suspended from, supported by, and anchored to the roof of the United Nations Secretariat Building.

31.)      The Contract Bid Documents were published in New York and disseminated to Massachusetts and New Jersey by email and United States Mail.

32.)      The Bid Documents imposed the obligations upon successful bidders to provide performance and payment bonds.

(2)    <u>Introduction of Project to Beeche Logistics</u>:

33.)      On or about July of 2008 the Whitestone Construction Co. (hereinafter "Whitestone") asked Beeche Logistics to estimate the cost of designing, constructing, installing and removing a scaffold system to be used to erect the exterior curtain wall on the Secretariat Building to be renovated by the United Nations. The estimate was to be utilized by Whitestone when submitting its bid to Skanska for the supply and erection of the new

curtain wall.

34.) Beeche Logistics reviewed in New York the Bid Documents produced and transmitted by United States mail, private carrier, and email by Skanska and relied thereon.

35.) The Bid Documents did not require the installation of a perimeter monorail system on the roof of the Secretariat Building.

36.) The roof of the Secretariat Building was not suitable for the installation of epoxy anchors to be used to secure towers from which scaffolding could be suspended. The unsuitability of the roof was a material site condition that should have been disclosed in the Bid Documents. At all times material hereto, Skanska knew that the unsuitability of the roof for the use of epoxy anchors was a material site condition.

37.) The Bid Documents did not disclose the fact that the roof was not suitable for use of epoxy anchors.

38.) Beeche Logistics provided Whitestone with drawings depicting a scaffold system to be leased to Whitestone and used to erect the exterior curtain wall on the Secretariat Building.

39.) The Beeche Logistic drawings did not include a perimeter monorail system for installation on the roof of the Secretariat Building.

40.) The proposed scaffold system anticipated securing the hoist towers on the roof by means of epoxy anchors.

41.) The drawings and estimate of Beeche Logistics were to be utilized by Whitestone when submitting its bid to Skanska for the erection of the curtain wall.

42.) The Beeche quote to Whitestone for the work was originally $7,200,000.

43.)     On or about November of 2008 Skanska in New York and New Jersey issued a bid

document entitled "Modified Exhibit A" to the Bid Documents for the Demolition and

Abatement of the Secretariat Building of the United Nations. The document was

transmitted by email and United States mail to Massachusetts. The demolition and

abatement referred to the use of scaffolding for the removal, in part, of curtain wall,

glass, asbestos and lead paint. Par. 1.1.10 stated that "an add alternate is requested for the

supply and installation of safety rail system...." Par. 3 entitled "Alternates" identified

specific alternatives to be priced as part of the bid to provide scaffolding. Par. 3.1 sought

the rental cost per month for scaffolding beyond the base rental period. Par. 3.13 sought

the rental cost per month per single scaffold. Par. 3.14 sought the rental cost per month

for all scaffolding.

44.)     On or about November of 2008 Skanska issued in New York and New Jersey a bid

document entitled "Modified Exhibit C" to the Bid Documents for the Demolition and

Abatement of the Secretariat Building of the United Nations. The document was

transmitted by email, private carrier, and United States mail to Massachusetts and New

York. Part I sought pricing for alternative work. Par. 5 sought pricing for the rental of

scaffolding equipment beyond the base rental period. Par. 9 sought pricing to provide and

maintain a safety railing. Part II pars. 3 and 4 sought pricing for rentals beyond the base

rental period. Part IV sought monthly rental rates for hanging platforms and scaffolding.

45.)     On or about November of 2008 Skanska issued in New York and New Jersey a bid

document entitled "Modified Exhibit D" to the Bid Documents for the Demolition and

Abatement of the Secretariat Building of the United Nations. The document was

transmitted by email, private carrier and United States mail to Massachusetts and New York. Part 4 required the lead times for mobilization by the supplier of the scaffold system. Part 5 required the "anticipated duration" of the work necessary to mobilize. Part 6 required alternative times for mobilization and demobilization.

46.)   In 2008 Pinnacle Construction Co. (hereinafter "Pinnacle") asked Beeche Logistics to estimate the cost of designing, constructing, installing and removing a scaffold system to be leased to Pinnacle and used to demolish the existing curtain wall on the Secretariat Building and abate asbestos and lead paint. The estimate was to be utilized by Pinnacle when submitting its bid to Skanska for the demolition of the existing curtain wall.

47.)   Beeche Logistics reviewed the Bid Documents produced by Skanska via United States Mail, private carrier and email and relied thereon.

48.)   The Bid Documents did not require the provision of a perimeter monorail system and did not disclose the condition of the roof of the Secretariat Building.

49.)   Despite the obligations imposed by law to contain particles generated when abating asbestos and lead paint, Beeche Logistics was directed by Skanska, as a means of reducing cost, to submit a bid that did not reflect a full negative pressure containment system typically required for asbestos and lead paint abatement in the City of New York.

50.)   On January 9, 2009 Sam McClaim representing Wing as Project Manager and Frederick Jornlid and Jack Raff representing Skanska met with Greg Beeche of Beeche Logistics at the Skanska Field Office at the United Nations Secretariat Building in New York. In the course of the meeting, Jornlid urged Beeche Logistics to reduce its price for the design, construction, installation, and removal of the scaffold system from $7,200,000 to

$5,200,000. Jornlid also urged Greg Beeche to provide without charge the labor necessary to move 20 platforms an additional five times beyond those moves which were to be included in the base price. The value of this proposed concession by Beeche Logistics was $435,000.

51.)     It was neither customary nor usual for a construction manager such as Skanska to participate in contract negotiations between a contractor such as Wing and subcontractor such as Beeche Logistics.

52.)     On or about January 16, 2009 Beeche Logistics participated in a meeting with Pinnacle, Baker and Wing in New York City to discuss questions to be posed to Skanska about the Project.

53.)     On or about January 26, 2009 Beeche Logistics in New York provided to Wing in Massachusetts a set of drawings depicting a scaffold system suitable for use to demolish the existing curtain wall on the Secretariat Building to be renovated by the United Nations. The Beeche quote was $5,200,000.

54.)     The system designed was consistent with the instructions of Skanska to provide a system that did not reflect a full negative pressure containment system typically used for asbestos and lead paint abatement in the City of New York. The system did not include a perimeter monorail and did anticipate the use of epoxy anchors to secure the hoist towers to be installed on the roof.

55.)     On or about February 23, 2009 Wing met with Skanska to discuss the proposal of Wing to perform demolition services at the Project.

56)      The scope of demolition services to be provided by Wing required the engagement by

Wing of multiple subcontractors and responsible management and coordination.

57.)     The scope of demolition services to be provided by Wing required the financial capacity

of Wing fund the obligations assumed by Wing with respect to its subcontractors.

58.)     Wing had been in existence less than three years and lacked the financial resources to

undertake the financial obligations of providing demolition services to the Project.

59.)     Wing employed Michael Adams as the Operations/Project Manager responsible for

administering the UN Project for Wing.

60.)     Mulcahey and Wing knew when they hired Michael Adams that Michael Adams had

been previously convicted and sentenced on April 3, 2008 for enterprise fraud associated

with fraudulent billing of the New York and New Jersey Port Authority for removal of

debris from "Ground Zero." New York v. Michael Adams, *et al*, Supreme Court of the

State of New York, Manhattan County, Indictment #6470-2004.

61.)     Skanska knew that Wing and Mulcahey lacked the financial and administrative resources

to undertake and complete the provision of demolition services to the Project in the event

the costs of completion exceeded the timely payments by Skanska to Wing for the

demolition services.

62.)     Skanska knew that concealed site conditions on the roof, unmet but known construction

requirements such as the provision of a perimeter monorail system,  unanticipated future

needs, and unanticipated future events would require after the commencement of

construction the obtention of labor and materials to complete the demolition services the

cost of which would exceed both the budget of the United Nations to pay for such

services and the guaranteed price contained in the UN/Skanska Agreement.

63.)     Skanska knew that the foreseeable bankruptcy of Wing (and the automatic stays

associated with the bankruptcy bo a debtor) during or after the Project could possibly

isolate Skanska from claims of subcontractors of Wing for non-payment by Wing and

Skanska of monies due under the Wing subcontracts.

64.)     On or about March 27, 2009 Skanska in New York and New Jersey issued a Modified

Proposal Form to be used by bidders for the demolition portion of the renovation project

for the UN Secretariat Building. The document was transmitted by email, private carrier,

and United States mail to Massachusetts. Part B.2 of the Form asked for the breakdown

of the costs of the scaffolding system to include: Engineering, Reinforcing of Existing

Structures, Mobilization, Demolition, 12 Month Rental, Demobilization, and the cost of

Insurance under the Contractor Controlled Insurance Program (CCIP).

65.)     On or about March 27, 2009 Skanska in New York and New Jersey issued Bid

Addendum #4 for a Suspended Scaffold System. The document was transmitted by email,

private carrier, and United States mail to Massachusetts. Paragraph 2 provided that the

Trade Contractor shall include in his base bid submission a rental cost of 12 months and

shall submit cost of rental for each system type. Paragraph 3 provided that the leased

scaffold system would be insured under the Contractor Controlled Insurance Program

(CCIP) administered by Skanska.

66.)     On or about March 27, 2009 Skanska in New York and New Jersey issued a Modified

Exhibit A to the Bid Documents. The document was transmitted by email, private carrier,

and United States mail to Massachusetts. Paragraph 1.1.10 identified an "add alternative"

to the contract for the supply and installation of a safety rail system. Paragraphs 3.2, 3.13

and 3.14 identified additional rental charges for the use of the scaffold beyond the base
rental period.

67.)    On or about March 27, 2009 Skanska in New York and New Jersey issued a Modified
Exhibit C to the Bid Documents. The document was transmitted by email, private carrier,
and United States mail to Massachusetts. Paragraph 5 required a rental figure for the use
of the leased scaffold beyond the base rental period. Paragraph 9 required a quote for the
provision of a safety railing system. Parts II and IV required rates for the lease of
scaffolding and hanging platforms on a monthly basis.

68.)    On or about March 27, 2009 Skanska in New York and New Jersey issued a Modified
Exhibit D to the Bid Documents. The document was transmitted by email, private carrier,
and United States mail to Massachusetts. Section 2 provided that the scaffold system
would be "mobilized by February-March of 2010. Section 4 required a statement of the
bidder's "lead" time to mobilize, Section 5 required the bidder to state the duration
required for the erection of the scaffold system, and Section 6 required alternative
schedules for mobilization and demobilization of the scaffold system.

69.)    Beeche Logistics was forwarded a copy of Addendum #4 and the Modified Exhibits by
Wing in Massachusetts and New York on March 31, 2009 by email, private carrier,
and/or United States mail.

70.)    Shortly thereafter, Beeche Logistics provided to Wing much of the information required
by the Skanska modifications to the bid documents. Beeche Logistics did not provide
information regarding mobilization dates and lead times.

71.)    In May of 2009 Wing met with Skanska to discuss the bid of Wing which included the

quotes from Beeche Logistics.

72.)    Greg Beeche was invited to attend a meeting at the United Nations in New York with

Skanska regarding the Project.

73.)    Greg Beeche attended the meeting representing Beeche Logistics. Sam McClain attended

the meeting representing Wing. Victor Marcantoni attended the meeting representing

New England Masterclimber. Jack Raff and Fredrik Jornlid attended the meeting

representing Skanska.  Skanska asked Beeche Logistics to reduce its quote to $5,000,000,

and Greg Beeche agreed.

74.)    Greg Beeche was also asked by Skanska if Beeche Logistics would contract with Wing

instead of Pinnacle to lease the scaffold system for the Project. Greg Beeche spoke with

Daniel Kolakowski, the Senior Vice President of Skanska and Senior Project Manager,

and explained that he had not done business with Wing and was concerned about getting

paid. Daniel Kolakowski said that he would protect Beeche Logistics by having Skanska

issue joint checks to Wing and Beeche Logistics if payments from Wing to Beeche

Logistics were not made. Even if joint checks were not issued, Beeche Logistics would

be paid by Skanska "in any case."

75.)    The representation of Daniel Kolakowski to Greg Beeche was consistent with Section 4.4

of Exhibit E of the Skanska/Wing Agreement (see below) which stated, in pertinent part:

> Construction Manager may, in its sole discretion, make payment for any portion
> of Trade Contractor's Work by joint check to Trade Contractor and the applicable
> Sub-Trade Contractor or benefit fund to which Trade Contractor has an
> outstanding obligation.

76.)    Greg Beeche relied upon the representations of Daniel Kolakowski and agreed that

Beeche Logistics would contract with Wing to supply the required scaffolding system

under lease.

77.)   The representation of Skanska in New York that it would by joint check pay the

obligations of Wing to Beeche Logistics was an express and enforceable commitment by

the general contractor to pay for the performance by Beeche Logistics. *See generally*

Perma Pave Contr. Corp. v. Paedegat Boat & Racquet Club, Inc., 156 A.D.2d 550, 551

(2nd Dept. 1989) ("it is a firmly established principle that a property owner who contracts

with a general contractor does not become liable to a subcontractor on a quasi-contract

theory unless it expressly consents to pay for the subcontractor's performance.")

78.)   Beeche Logistics on September 1, 2010 advised Wing by letter that the scaffolding

system should not be operated "with tarps up" in winds in excess of 30 miles per hour.

79.)   On or about October 12, 2009 Mike Adams of Wing in Massachusetts sent by email,

private carrier and/or United States mail to Beeche Logistics in New York a Letter of

Intent incorporating by reference the Skanska Contract Bid Documents and Skanska

Exhibits A, B, C. and D and agreeing to pay $5,000,000 excluding taxes for the work

described therein. Although there was no signed written agreement between Wing and

Beeche Logistics, Wing gave Beeche Logistics a symbolic but ineffectual "notice to

proceed."

80.)   The October 12, 2009 Letter contained the representation that upon the execution of a

contract between Wing and Skanska (hereinafter "Skanska/Wing Agreement"), Wing

would present Beeche Logistics with a contract between Wing and Beeche Logistics for

execution (hereinafter "Wing/Beeche Logistics Agreement).

81.)   The October 12, 2009 Letter referenced the Contractors Construction Schedule, a copy of

which was not given to Beeche Logistics.

82.)     Notwithstanding the absence of an executed Wing/Beeche Logistics Agreement, Beeche

Logistics relied on the representations of Wing contained in the October 12, 2009 Letter

and initiated the design/construction process.

3.)     Skanska/Wing Agreement

83.)     On or about October 14, 2009, Wing and Skanska entered into the Skanska/Wing

Agreement.

84.)     Wing did not provide Beeche Logistics with a copy of a Wing/Beeche Logistics

Agreement for review and execution until February 25, 2010 - nearly five months after

the execution of the Skanska/Wing Agreement.

85.)     The Skanska/Wing Agreement provided a process for the timely approval of and payment

by Skanska to Wing and Beeche Logistics for work provided by Wing and Beeche

Logistics in the base Skanska/Wing Agreement.

86.)     Beeche Logistics was to submit to Wing an AIA Payment Application on or about the

25th of each month with amounts for work projected to be completed by the end of the

calendar month.

87.)     Wing and Skanska were to review and revise the Payment Application and with the

signature of Beeche Logistics resubmit the revised Payment Application to Skanska by

the end of the calendar month.

88.)     The Payment Application was to be approved by Skanska and processed for payment

with payment made by Skanska to Wing by the 15th of the second month thereafter.

89.)     Payment to Beeche Logistics by Wing was to occur within seven days of the receipt of

payment by Wing from Skanska - typically no later than the 22nd of the month when Wing received payment from Skanska.

90.)   The Skanska/Wing Agreement required Wing to provide Skanska with releases executed by Beeche Logistics as a condition of Skanska paying Wing on Wing Applications for Payment involving work performed by Beeche. This provision assured Skanska that Beeche Logistics would not file a lien for work already paid for by Skanska and assured Beeche Logistics that payments to Wing for work performed by Beeche Logistics would be paid by Wing to Beeche Logistics.

91.)   The Skanska/Wing Agreement provided a process for the timely approval of and payment by Skanska to Wing and its sub-contractors for extra work not included in the base Skanska/Wing Agreement.

92.)   The Skanska/Wing Agreement required Wing to apply to Skanska for payment for base and extra work performed by Wing and Beeche Logistics on a timely basis.

93.)   The Skanska/Wing Agreement was subject to the implied covenant of good faith and fair dealing.

94.)   Beeche Logistics was an intended third party beneficiary of the implied covenant of good faith and fair dealing and the application and payment provisions of the Skanska/Wing Agreement.

(4)     Wing/Beeche Logistics Agreement:

95.)   On November 16, 2009 Beeche Logistics sent a letter from New York to Wing in Massachusetts providing the details and timing of the proposed contractual obligations between Wing and Beeche Logistics.  (A true copy of the Letter is attached as Exhibit 1

to the Affidavit of Kirk Beeche.)

96.)    The transaction was cast as an equipment lease for a term of 12 months with a rent of
        $5,000,000 for twenty units of scaffolding, multiple hoists and multiple hoisting towers.
        The rent included labor and materials necessary for designing, manufacturing, installing
        and removing the leased equipment from the site and a given number of scaffold moves
        during the lease term.

97.)    There was an additional alternate charge of $4,350 for each scaffold move beyond that
        specified in the contract.

98.)    There was alternate additional rent of $95,000 per month for units not returned after the
        twelve month rental period.

99.)    The Schedule of Values assumed the existence of a Wing/Beeche Logistics Agreement
        and identified the work to be performed by Beeche Logistics for each month between
        January of 2010 and July of 2011, the month when the system was to be removed from
        the Project.

100.)   Beeche Logistics was to have a period of five months between the execution of the
        Wing/Beeche Agreement and the delivery and installation of the scaffolding system to
        the Project. This period would be utilized for the design, permitting and construction of
        the scaffolding system. $1,000,000 was to be paid by Wing to Beeche Logistics within
        thirty days of contracture as a mobilization fee. These funds were to cover a significant
        portion of the costs of materials used for building the system.

101.)   On December 10, 2009 Wing in Massachusetts sent Beeche Logistics in New York by
        email, private carrier or United States mail a second symbolic "notice to proceed" subject

to final contract terms being acceptable to both Wing and Beeche Logistics. However, Wing did not include a form of Wing/Beeche Logistics Agreement to be reviewed and executed by Beeche Logistics.  (A true copy of the Letter is attached as Exhibit 2 to the Affidavit of Kirk Beeche.)

102.)   On or about February 25, 2010 (three months after Beeche Logistics sent its November 16, 2009 letter detailing values, schedules and lead times to Wing),Wing provided Beeche Logistics by private carrier or United States mail a Standard Form Agreement Between Contractor and Subcontractor (the "Wing/Beeche Logistics Agreement") for review and signature. The parties executed the Agreement on February 25, 2010.  (A true copy of the Agreement is attached as Exhibit 3 to the Affidavit of Kirk Beeche.)

103.)   Article 1.1 itemized the "Subcontract Documents" incorporated within the Wing/Beeche Agreement. They included the Wing/Beeche Agreement, the Skanska/Wing Agreement, modifications to the Skanska/Wing Agreement, documents listed in Article 16 of the Wing/Beeche Agreement, and modifications to the Wing/Beeche Agreement.

104.)   Despite repeated requests of Beeche Logistices, neither Wing nor Skanska provided Beeche Logistics with an executed copy of the Skanska/Wing Agreement. Wing did provide Beeche Logistics excerpts of selected Exhibits to the Skanska/Wing Agreement.

105.)   Article 3.1.1 of the Wing/Beeche Logistics Agreement required Wing to coordinate the work at the site to allow Beeche to perform its obligations.

106.)   Section 2.7 of Exhibit E to the Skanska/Wing Agreement was incorporated by reference within the Wing/Beeche Logistics Agreement and required Skanska and Wing to "protect from damage" all equipment provided by Beeche Logistics to the Project site. Beeche

Logistics was to be reimbursed by CCIP for damage to Beeche Logistics equipment

sustained at the site. Wing was to cooperate with Beeche Logistics in processing

insurance claims with CCIP.

107.)   Article 3.2.5 required Wing to provide Beeche Logistics with all information necessary

for Beeche Logistics to be able to give notice of and enforce mechanic's lien rights.

108.)   Given that the United Nations was a sovereign with immunity from process, the Article

was misleading, and the right to impose a mechanic's lien upon the property of the UN

was illusory.

109.)   Beeche Logistics relied on the representations contained in Article 3.2.5 and inferred that

the property of the UN was subject to a mechanic's lien under New York Lien Law.

110.)   Section 4.5 of Exhibit E to the Skanska/Wing Agreement was incorporated by reference

within the Wing/Beeche Logistics Agreement and stated, in part:

> All funds paid to Trade Contractor in connection with the Project constitute funds
> held in trust by Trade Contractor. Trade Contractor agrees to apply first to the
> payment of : (I) non-exempt taxes owed by Trade Contractor based on labor,
> services, equipment, materials supplies and other items acquired, performed,
> furnished or used in connection with the performance of the Work; (ii) Trade
> Contractor bond and insurance premiums; and (iii) sub-Trade Contractors and any
> applicable Sub-Trade Contractor benefit funds.

111.)   Beeche Logistics relied on the representations contained in Section 4.5 and inferred that

Wing was required to post payment and performance bonds which would have been

available to ensure payment of monies by Wing to Beeche Logistics due under the

Wing/Beeche Logistics Agreement.

112.)   Article 3.3.2 allowed Wing to "back charge" Beeche Logistics for a Beeche Logistic

failure to perform the work required. The "back charges" were allowed upon the

conditions that Wing provide three days written notice prior to providing services to remedy the Beeche Logistic failure and Wing maintain detailed records supporting each back charge and its costs.

113.) At no time in the course of the Wing/Beeche Logistics Agreement did Wing provide Beeche Logistics with the three days written notice or prepare a record supporting the "back charges" prior to the assessment by Wing of its "back charges."

114.) Article 5.1 required Beeche Logistics to perform extra work when instructed by Wing to do so.

115.) Article 5.2 defined the protocol for Wing to require Beeche Logistics to perform extra work, incur additional expense and/or expend additional time. The Article required Wing to issue written instructions to Beeche Logistics and Beeche Logistics to submit a written claim for adjustment of the contract ("extras").

116.) Section 13.2 of Exhibit E to the Skanska/Wing Agreement was incorporated by reference in the Wing/Beeche Logistics Agreement and stated that a dispute over pending payments for "extras" or an alleged breach by a contracting party did not justify a refusal by Beeche Logistics to continue work under the Agreement.

117.) Article 6 incorporated Article 13 of Exhibit E of the Skanska/Wing Agreement and suggested how disputes involving the values of "extras" and "back charges" were to be resolved.

118.) The dispute resolution language involved first mediation and then arbitration and only "suggested" the means for resolving the disputes because the language in Article 13 of Exhibit E was specific to the Skanska/Wing Agreement and incorporated by reference the

equally specific dispute resolution language contained in the Construction Management

Agreement between the United Nations and Skanska.

119.)    Article 8 defined the scope of the work.  Exhibit A to the Agreement contained the

details. The details included, in part:

> 3. A price of $5,000,000 to be paid to Beeche Logistics based on the attached schedule of values.
>
> 4. The payment of retainage to Beeche Logistics upon the removal from the roof of the Secretariat Building of the hoist towers previously supplied and installed by Beeche Logistics to support the scaffold platforms.
>
> 5. The system was to be installed by Beeche Logistics within 42 calendar days of receipt of authorization to proceed with site work. (This was contrary to the schedule contained in the Letter of Beeche Logistics to Wing dated November 16, 2009 calling for a mobilization period of five months - i.e. 150 days. However, Wing never sent a notice to proceed to Beeche Logistics after February 25, 2010, and Beeche Logistics was never "late" under the 42 day calendar.)
>
> 6a. If Beeche Logistics was delayed in the commencement, prosecution or completion of the work, the installation date was extended by the period of delay.
>
> 7.  Beeche Logistics was to obtain insurance following the CCIP requirements of the Construction Manager.
>
> 10. The scaffold tiers were to be provided with tarps to limit the ingress of rainwater, snow and debris.
>
> 11. The scaffold tiers were to be provided with soft rollers to limit damage to newly installed curtain walls.
>
> 14. After initial placement of all 20 -28' scaffolding units, Beeche Logistics was to move 5 units at a time, 15 additional times as part of base contract. Reimbursement of any additional moves was to be based on the Skanska/Wing Agreement.(This was contrary to the fixed figure of $4,500 per additional move contained in the Letter of Beeche Logistics to Wing dated November 16, 2009.)
>
> 15. The rental term was twelve months from date of delivery and

installation.

16. Additional rental per unit for the "entire system" was $95,000 per month.

110.)  Section 2.5 of Exhibit A to the Skanska/Wing Agreement incorporated by reference in the Wing/Beeche Logistics Agreement required Wing to "extend the rental period" beyond 12 months at Wing's expense if Wing did not complete its work within the 12 month period "due to reasons for which" Wing was responsible.

111.)  Section 1.4 of Exhibit C to the Wing/Skanska Agreement identified an "alternative" value of $250,000 for each month to extend the scaffold lease.

112.)  Article 9 defined the dates of commencement and substantial completion. The date of commencement was defined as "the date of this Agreement" in 9.1, and the Substantial Completion date (i.e. delivery and installation of the scaffold system at the UN) was defined as April 15, 2010 in 9.3 "subject to adjustments."

113.)  The stated substantial completion date was inconsistent with the five month period for mobilization scheduled in the November 10, 2009 letter from Beeche Logistics to Wing.

114.)  Article 10.1 provided that the Subcontract Sum was $5,000,000. Article 10.3 provided that rent for units beyond one year would be calculated at $95,000 per month.

115.)  Article 11.1 provided for progress payments. Progress payments were to be made by Wing based upon applications for payment submitted by Beeche Logistics. Wing was obligated to either post a payment bond or hold money it received from Skanska for the benefit of Beeche Logistics. "Unless the Contractor provides the Construction Manager with a payment bond in the full penal sum of the Contract Sum, payments shall be held by the Contractor and Subcontractor for those contractors or suppliers who performed

Work or furnished materials, or both, under contract with the Contractor or Subcontractor

for which payment was made to the Contractor by the Construction Manager or to the

Subcontractor by the Contractor, as applicable."

116.) Payment applications were to be submitted monthly. Article 11.2. Wing was to pay

Beeche Logistics within seven days of receiving funds from Skanska.

117.) Upon substantial completion (i.e. removal of the scaffolding system from the roof of the

United Nations Secretariat Building), Beeche Logistics was entitled to receive from Wing

all funds due including retainage. Art. 12.1.

118.) Article 13 provided that a contractor controlled insurance program "CCIP insurance" was

to cover on-site risks. (See Section 1 of Exhibit C to Skanska/Wing Agreement

incorporated by reference in the Wing/Beeche Logistics Agreement.)

119.) Article 13.5 of Exhibit E to the Skanska/Wing Agreement incorporated by reference in

the Wing/Beeche Agreement provided that the Skanska/Wing Agreement was "governed

and construed in accordance with the laws of the State of New York."

120.) The Wing/Beeche Agreement was subject to the implied covenant of good faith and fair

dealing.

121.) The Wing/Beeche Agreement anticipated that Beeche Logistics would use epoxy anchors

to secure the hoist towers to the roof of the Secretariat Building.

122.) The Wing/Beeche Agreement did not require Beeche Logistics to provide and install a

monorail system to the roof of the Secretariat Building.

123.) Skanska approved the Wing/Beeche Agreement.

124.) When Skanska approved the Wing/Beeche Agreement, Skanska knew that the Project

would require the supply and installation of a monorail on the roof of the Secretariat Building and that the roof could not accommodate the use of epoxy anchors to secure hoist towers.

125.)   Had Skanska provided this information to Beeche Logistics, the Wing/Beeche Agreement would have included a price for providing the monorail system and anchors secured to the structural steel of the roof support system by threaded studs (as opposed to epoxy) and would have included a profit to Beeche Logistics based upon a multiple of the actual cost for providing that additional work.

(5)   Contract Performance:

126.)   Wing employees performed coordination but its personnel performed no construction at the site in New York. The demolition and construction abatement at the site that was the subject of the Skanska/Wing Agreement was performed by the subcontractors of Wing.

127.)   At all times material hereto the defendant Mulcahey directed the employees of Wing to engage in the following conduct and ratified the actions of those Wing employees with full knowledge of the consequences of those actions to Beeche Logistics.

128.)   On or about March 5, 2010 Skanska and Wing entered into a change order which altered the performance schedules Wing was to impose on its sub-contractors. Beeche Logistics was not consulted and did not agree with the changes.

129.)   On or about March 19, 2010 Wing and Skanska forwarded by email, private carrier or United States mail a **BILL OF SALE** to Beeche Logistics for execution.  (A true copy of the Bill of Sale is attached as Exhibit 4 to the Affidavit of Kirk Beeche.)

130.)   On **March 19, 2010** Beeche Logistics executed a **BILL OF SALE** at the request of

Wing and Skanska transferring title to the scaffolding system being constructed by

Beeche Logistics at its factory for the UN Project. Title was to be held by the United

Nations only until the system was delivered, installed and approved at the United

Nations. The stated consideration for the sale was $1,000,000 and other good and

valuable consideration. Notwithstanding, no consideration was paid to Beeche Logistics

when Beeche Logistics executed and delivered the **BILL OF SALE**.

131.)  The Bill of Sale was not required by the Wing/Beeche Logistics Agreement and did not

modify the terms of the Wing/Beeche Logistics Agreement.

132.)  The Bill of Sale was intended to secure the interest of the United Nations in the scaffold

system pending delivery and installation of the system at the United Nations.

133.)  Beeche Logistics was to insure the scaffolding system until delivery to and installation at

the United Nations. Upon delivery, the CCIP coverage would attach.

134.)  On or about **March 23, 2010** Beeche Logistics in New York submitted **Application #1** to

Wing in Massachusetts for payment under the Wing/Beeche Logistics Agreement in the

amount of $1,298,350.  (A true copy of the **Application** is attached as Exhibit 5 to the

Affidavit of Kirk Beeche.)

135.)  On April 16, 2010 Wing sent Beeche Logistics a Project Memo by email instructed

Beeche Logistics to commence installation of the scaffold system on or before June 14,

2010.   (A true copy of the email is attached as Exhibit 6 to the Affidavit of Kirk Beeche.)

136.)  On or about **April 20, 2010** Beeche Logistics in New York submitted **Application #2** to

Wing in Massachusetts for payment under the Wing/Beeche Logistics Agreement in the

additional amount of $467,036.10 with a total due of $1,850,429 and retainage of

$185,042.90.   (A true copy of the **Application** is attached as Exhibit 7 to the Affidavit of Kirk Beeche.)

137.)   On May 4, 2010 Beeche Logistics received its first payment from Wing in the amount of $1,198,350. There was no indication as to how the payment was calculated.

138.)   The first payment was late. It was due before January 1, 2010 under the Letter of Intent dated October 12, 2009. The first payment was due on March 19, 2010 under the Bill of Sale dated March 19, 2010.

139.)   The first payment was $100,000 less than the amount due under **Application #1.** Title to the scaffold system was now held by the United Nations and no retainage was justified.

140.)   On or about  **May 25, 2010** Beeche Logistics in New York submitted **Application #3** to Wing in Massachusetts for payment under the Wing/Beeche Logistics Agreement in the additional amount of $73,773 with $1,932,400 completed and stored and retainage of $193,240.   (A true copy of the **Application** is attached as Exhibit 8 to the Affidavit of Kirk Beeche.)

## (a)      Contract Change Proposal 01.1:

141.)   The roof of the Secretariat Building at the United Nations was not ready to receive the Beeche Logistics scaffolding system forty-two days after the execution of the Wing/Beeche Logistics Agreement.

142.)   On or about April 16, 2010 Beeche Logistics inspected the roof of the UN Secretariat Building to determine whether the roof was ready to accept the installation of the "towers" from which the scaffolding was to be suspended and commence installation. It was learned by Beeche Logistics that the roof could not structurally support epoxy

secured anchors for the hoist towers.

143.)    Shortly thereafter Greg Beeche of Beeche Logistics sent a letter to Michael Adams of Wing and proposed a solution whereby the anchors would be secured by drilling cores in the roof to access the structural steel. The anchors would then be secured by threaded shear connector studs welded to the structural steel. (A true copy of the letter is attached as Exhibit 9 to the Affidavit of Kirk Beeche.)

144.)    On or about June 17, 2010 Wing and Skanska agreed to the solution proposed by Beeche Logistics for which a change order would issue and for which Beeche Logistics would receive additional compensation.  (A true copy of **Contract Change Proposal 01.1** with a "Price Date" of 6/17/10 is attached as Exhibit 10 to the Affidavit of Kirk Beeche.)

145.)    Wing, Skanska, and Beeche Logistics termed the roof a "Differing Site Condition" within the meaning of Section 2.3 of Exhibit E of the Skanska/Wing Agreement as incorporated in the Wing/Beeche Logistic Agreement.

146.)    Beeche Logistics relied on the representations of Wing and Skanska that it would be paid an "extra" and performed the extra work based on the cost of labor and materials plus 15%.

147.)    On November 4, 2010 **Contract Change Proposal 01.1** was prepared by Beeche Logistics after the work was completed through July 29, 2010 and submitted for payment by Wing and Skanska with a breakdown of the work performed justifying the amount of the extra calculated to be $175,223 based on time and materials and a 15% profit. The time for Beeche Logistics to deliver and install the scaffold system was extended by 10 days.(A true copy of **Contract Change Proposal 01.1** with a "Print Date" of 11/4/10 is

attached as Exhibit 10 to the Affidavit of Kirk Beeche.)

148.)   On November 5, 2010 Michael Adams of Wing sent a letter to Fredrik Jornlid of Skanska

advising that Wing had approved of **Contract Change Proposal 01.1** in the amount of

$182,719.26. That same day Douglas Mains, a Project Manager of Skanska, approved

**Contract Change Proposal 01.1** in the reduced amount of $133,362. (A true copy of

letter dated 11/5l10 with hand written edits and supporting documentation is attached as

Exhibit 11 to the Affidavit of Kirk Beeche.)

149.)   Beeche Logistics relied upon the representation of Skanska that it would be paid and

continued to provide labor and material to the Project.

150.)   On May 27, 2011 - <u>six months later </u>- Daniel Kolakowski of Skanska sent an email to

Greg Beeche of Beeche Logistics stating in part that "**Skanska has agreed to pay GBL**

**$120,816 for the additional work associated with this method of attaching to the**

**roof**." (A true copy of email dated 5/27/11 is attached as Exhibit 12 to the Affidavit of

Kirk Beeche.)

151.)   Beeche Logistics consented to the $55,000 reduction in price because Wing and Skanska

had intentionally withheld payment to Beeche Logistics for its work performed to date

and had "leverage" over Beeche Logistics by virtue of their intentional breach of the

payment provisions included in the Skanska/Wing and Wing/Beeche Logistics

Agreements

152.)   On **June 23, 2010** Beeche Logistics in New York submitted **Application #4** to Wing in

Massachusetts for payment under the Wing/Beeche Logistics Agreement in the additional

amount of $124,830 with $2,071,100 completed and stored and retainage of $207,110. (A

true copy of the **Application** is attached as Exhibit 13 to the Affidavit of Kirk Beeche.)

153.) On July 2, 2010 Wing, Inc. paid Beeche Logistics $467,036.10. There was no indication as to how the payment was calculated. The payment should have been made no later than June 22, 2010 and was late.

154.) On **July 15, 2010** Beeche Logistics in New York submitted **Application #5** to Wing in Massachusetts for payment under the Wing/Beeche Logistics Agreement in the additional amount of $114,327 with $2,198,130 completed and stored and retainage of $219,813. (A true copy of the **Application** is attached as Exhibit 14 to the Affidavit of Kirk Beeche.)

155.) On August 9, 2010 Wing paid Beech Logistics $73,773.90. There was no indication as to how the payment was calculated. The payment should have been made no later than July 22, 2010 and was late.

156.) On **August 15, 2010** Beeche Logistics in New York submitted **Application #6** to Wing in Massachusetts for payment under the Wing/Beeche Logistics Agreement in the additional amount of $13,050 with $2,212,260 completed and stored and retainage of $221,263. (A true copy of the **Application** is attached as Exhibit 15 to the Affidavit of Kirk Beeche.)

157.) On August 17, 2010 Wing paid Beech Logistics $124,830. There was no indication as to how the payment was calculated.

158.) On **August 23, 2010** Beeche Logistics delivered, installed and turned over platform quadrants to the United Nations for the Southwest Quadrant of the Secretariat Building. (A true copy of letter dated 10/20/11 from Kirk Beeche to Michael Adams itemizing the turn over dates is attached as Exhibit 16 to the Affidavit of Kirk Beeche.)

**(b)**     **Contract Change Proposal 01.3:**

159.)     On August 24, 2010 Beeche Logistics was instructed by Wing to obtain power from a
source that was not the subject of the bid documents or Wing/Beeche Logistics
Agreement. Wing in Massachusetts, Skanska in New York and New Jersey, and Beeche
Logistics in New York agreed that Beeche Logistics would provide five additional power
cables to power the scaffold system as an extra. (A true copy of **Contract Change
Proposal 01.3** with a "Price Date" of 8/24/10 is attached as Exhibit 17 to the Affidavit of
Kirk Beeche.)

160.)     Beeche Logistics relied on the representations by email of Wing in Massachusetts and
Skanska in  New York and New Jersey that it would be paid an "extra" and provided the
labor and material requested.

161.)     On August 25, 2010 **Contract Change Proposal 01.3** was prepared by Beeche Logistics
after the cables were provided and the work was completed and submitted for payment
by Wing and Skanska with a breakdown of the work performed justifying the amount of
the extra calculated to be $5,546 based on time and materials. The time for Beeche
Logistics to deliver and install the scaffold system was extended five days. (A true copy
of **Contract Change Proposal 01.3** with a "Print Date" of 8/25/10 is attached as Exhibit
17 to the Affidavit of Kirk Beeche.)

162.)     On April 25, 2011 Wing approved **Contract Change Proposal 01.3** at $5,546 with a five
day extension. (A true copy of **Contract Change Proposal 01.3** with a "Price Date" of
8/24/10 is attached as Exhibit 17 to the Affidavit of Kirk Beeche.)

163.)     On September 4, 2010 Douglas Mains of Skanska approved **Contract Change Proposal**

**01.3** at the reduced price of $2,795.(A true copy of Wing Work Sheet dated 9/4/10 as edited by Douglas Mains of Skanska with an "approved" price of $2,795 is attached as Exhibit 18 to the Affidavit of Kirk Beeche)

### ( c)     Contract Change Proposal 01.4:

164.)   On or before August 29, 2010 Wing and Skanska instructed Beeche Logistics to provide a perimeter guard rail system to be attached to the hoist "towers" on the roof of the United Nations Secretariat Building. (A true copy of **Contract Change Proposal 01.4** with a "Price Date" of 8/29/10 is attached as Exhibit 19 to the Affidavit of Kirk Beeche.)

165.)   The perimeter guard rail system was specifically identified as an alternate add on in the Bid Documents prepared by Skanska.

166.)   Beeche Logistics relied on the representations by email of Wing in Massachusetts and Skanska in New York and New Jersey that it would be paid an "extra" and provided the labor and material requested.

167.)   It was agreed among Wing in Massachusetts, Skanska in New York and New Jersey, and Beeche Logistics in New York that Beeche Logistics would supply and install the guard rail system at the agreed price of $48,354. The time for Beeche Logistics to perform its contractual obligations was extended five days.

168.)   On August 29, 2010 **Contract Change Proposal 01.4** was prepared by Beeche Logistics to provide a perimeter guard rail system to be attached to the hoist "towers" on the roof of the United Nations Secretariat Building . The Proposal was submitted for payment by Wing and Skanska with a breakdown of the work performed justifying the amount of the extra calculated to be $48,354 based on time and materials. The time for Beeche

Logistics to deliver and install the scaffold system was extended five days.  (A true copy

of **Contract Change Proposal 01.4** with a "Print Date" of 4/26/12 is attached as Exhibit

19 to the Affidavit of Kirk Beeche.)

169.)  On April 25, 2011 - <u>eight months later </u> - Wing and Skanska approved **Contract Change

**Proposal 01.4** at the reduced price of $46,476 with a five day extension.  (A true copy of

**Application for Payment #15** prepared by Wing dated April 25, 2011, page 2 Item 17:

"CO #004 OSHA Railings at screen wall $46,476  attached as Exhibit 20 to the Affidavit

of Kirk Beeche.)

170.)  Beeche Logistics consented to the reduction in price because Wing and Skanska had

intentionally withheld payment to Beeche Logistics for its work performed to date and

had "leverage" over Beeche Logistics by virtue of their intentional breach of the payment

provisions included in the Skanska/Wing and Wing/Beeche Logistics Agreements.

171.)  In September of 2010 Wing in Massachusetts under the direction and with the knowledge

of Mulcahey and Skanska advised Beeche Logistics in New York that Wing would

prepare future Applications for Payment to be signed by Beeche Logistics for

"submission" to Wing and Skanska. Wing advised Beeche Logistics that this would

expedite payment to Beeche Logistics by eliminating the approval of Wing for

submission of payment applications to Skanska. The change in "protocol" and procedure

imposed by Wing and Skanska was not the voluntary act of Beeche Logistics.

172.)  Thereafter, Wing prepared the Applications for Payment for Beeche Logistics subject to

the implied covenants of good faith and fair dealing.

173.)  Beeche Logistics relied on the representations of Wing in Massachusetts that the

Applications for Payment would be processed fairly and more expeditiously and agreed
to the Wing proposal.

174.) Applications for Payment prepared by Wing in the name of Beeche Logistics were
subject to the review and approval of Mulcahey.

175.) All requests submitted by Wing to Beeche Logistics for the provision of extra work and
materials was reviewed and approved by Mulcahey prior to the publication of the request
to Beeche Logistics and Skanska.

176.) All Contract Change Proposals submitted by Beeche Logistics to Wing were approved or
rejected by Mulcahey.

177.) On **September 8, 2010** Wing in Massachusetts drafted and transmitted by email Beeche
Logistics **Application #7,** and Beeche Logistics in New York signed said Application
for Payment under the Wing/Beeche Logistics Agreement in the additional amount of
$319,329 with $2,567,440 completed and stored and retainage of $256,744. The executed
Application was transmitted by private carrier or United States mail and reflected that
Beeche Logistics had completed all of the manufacture, almost all of the transportation
and approximately half of the installation for all of the scaffolding.  (A true copy of the
**Application** is attached as Exhibit 21 to the Affidavit of Kirk Beeche.)

178.) On **September 13, 2010** Beeche Logistics turned over the scaffold system for the
Northwest Quadrant of the UN Secretariat Building to the United Nations. (A true copy
of letter dated 10/20/11 from Kirk Beeche to Michael Adams itemizing the turn over
dates is attached as Exhibit 16 to the Affidavit of Kirk Beeche.)

179.) On September 17, 2010 Beeche Logistics turned over the scaffold system for the

Northeast Quadrant of the UN Secretariat Building to the United Nations. (A true copy of

letter dated 10/20/11 from Kirk Beeche to Michael Adams itemizing the turn over dates

is attached as Exhibit 16 to the Affidavit of Kirk Beeche.)

180.)   On September 21, 2010 Wing paid Beeche Logistics $127,377. There was no indication

as to how the payment was calculated. The September payment included amounts due in

July and August and was late.

**(d)     Contract Change Proposal 01.5:**

181.)   On or about September 24, 2010 Wing in Massachusetts and Skanska in New York and

New Jersey requested that Beeche Logistics provide temporary auxiliary tie-back anchor

brackets located on various floors of the UN Secretariate Building.  (A true copy of the

**Contract Change Proposal 01.5** with a Price Date of 9/24/10 is attached as Exhibit 22

to the Affidavit of Kirk Beeche.)

182.)   Beeche Logistics relied on the representations of Wing in Massachusetts and Skanska in

New York and New Jersey that it would be paid an "extra" and provided the labor and

material requested.

183.)   On September 28, 2010 **Contract Change Proposal 01.5** was prepared by Beeche

Logistics to provide temporary auxiliary tie-back anchor brackets located on various

floors of the UN Secretariat Building. The Proposal was submitted for payment by Wing

and Skanska with a breakdown of the work performed justifying the amount of the extra

calculated to be $11,396 based on time and materials. The time for Beeche Logistics to

deliver and install the scaffold system was extended two days. (A true copy of the

**Contract Change Proposal 01.5** with a Print Date of 9/28/10 is attached as Exhibit 22 to

the Affidavit of Kirk Beeche.)

184.) On April 25, 2011 Wing and Skanska approved **Contract Change Proposal 01.5** at the reduced price of $11,347 with a two day extension.  (A true copy of **Application for Payment #15** prepared by Wing dated April 25, 2011, page 2 Item 16: "CO #003 Auxilliary tie back anchors $11,347  attached as Exhibit 20 to the Affidavit of Kirk Beeche.)

185.) On **September 25, 2010** Wing in Massachusetts drafted and transmitted by email Beeche Logistics **Application #8,** and Beeche Logistics signed said Application  for Payment in New York under the Wing/Beeche Logistics Agreement in the additional amount of $182,691.90 with $2,770,431 completed and stored and retainage of $277,043.10 for work through September 30, 2010. (A true copy of the **Application** is attached as Exhibit 23 to the Affidavit of Kirk Beeche.)

186.) On October 5, 2010 Wing paid Beeche Logistics $319,329. There was no indication as to how the payment was calculated. The payment was due in September of 2010 and was late.

187.) Delivery by Beeche Logistics of the last components of the scaffolding system to the Project site was delayed because the Project was "shut down" for two weeks due to a meeting of the General Assembly.

188.) On **October 24, 2010** Beeche Logistics turned over the scaffold system for the Southeast Quadrant of the UN Secretariat Building to the United Nations. (A true copy of letter dated 10/20/11 from Kirk Beeche to Michael Adams itemizing the turn over dates is attached as Exhibit 16 to the Affidavit of Kirk Beeche.)

189.) **As of October 24, 2010, Beeche Logistics had turned over and installed all of the leased scaffolding and scaffold system components to the United Nations.**

190.) Skanska did not back charge Wing for the failure of Beeche Logistics to deliver and install all of the scaffold systems within forty-two days of the execution of the February 25, 2010 Wing/Beeche Logistics Agreement. (A true copy of email dated 5/27/11 from Skanska is attached as Exhibit 12 to the Affidavit of Kirk Beeche.)

191.) **As of October 24, 2010, the obligation of Beeche Logistics to insure the scaffold system under the BILL OF SALE dated March 19, 2010 expired.**

192.) As of October 24, 2010, the ownership of the scaffold system as represented by the BILL OF SALE dated March 19, 2010 reverted to Beeche Logistics.

193.) On **October 25, 2010** Wing in Massachusetts drafted and transmitted by email Beeche Logistics **Application #9,** and Beeche Logistics in New York signed said Application for Payment under the Wing/Beeche Logistics Agreement in the additional amount of $190,293.99 with $2,981,868.77 completed and stored and retainage of $298,186.88 for work through October 31, 2010. (A true copy of the **Application** is attached as Exhibit 24 to the Affidavit of Kirk Beeche.)

194.) **Application #9** did not include the Contract Change Proposals approved among Skanska, Wing, and Beeche Logistics.

195.) Wing did not assert a "back charge" in **Application #9** for the failure of Beeche Logistics to deliver and install any portion of the scaffolding system within forty-two days of the execution of the Wing/Beeche Logistics Agreement on February 25, 2010.

196.) Due to the failure of Wing and Skanska to execute the Wing/Skanska Agreement in a

timely fashion and the failure of Wing to provide and execute the Wing/Beeche Logistics

Agreement in a timely fashion, Beeche Logistics had been denied the lead time for

mobilization detailed in the November 16, 2009 letter from Beeche Logistics to Wing. (A

true copy of the letter regarding scheduling is attached as Exhibit 1 to the Affidavit of

Kirk Beeche.)

197.)   Due to the failure of Wing to timely provide and execute the Wing/Beeche Logistics

Agreement, Beeche Logistics was required to advance its own funds for the design,

construction and installation of the scaffold system without the timely payments of

contract monies from Skanska and Wing consistent with the schedule of payments

contained in the November 16, 2009 letter from Beeche Logistics to Wing and/or the

Wing/Beeche Logistics Agreement..

198.)   As an accommodation to Beeche Logistics, Wing agreed to reallocate the Schedule of

Values to allow Beeche Logistics additional funds upon the turn over of the scaffold

system to the United Nations.

199.)   **Application # 9** included a reallocation of the Schedule of Values contained in Exhibit B

to the Wing/Beeche Logistic Agreement. The "Rental Value" of $1,451,000 was reduced

by $465,064 to $985,936 and reallocated to "Labor for Installation" originally priced at

$320,000 and now increased to $785,064. As an accommodation, Beeche Logistics

agreed to an additional reduction of $298,000 from the "Rental Value" of $985,936 for a

net "Rental Value" of $687,936. The $298,000 was then added to the original "Labor for

Dismantle Value" of $202,000 for a net "Labor for Dismantle Value" of $500,000. This

allowed for a lower monthly rental charge due from Wing to Beeche Logistics during the

Project and the payment by Wing of a larger amount to Beeche Logistics at the end of the Project. Notwithstanding the re-allocations, the Contract Price remained the same $5,000,000 (not including Change Orders).

200.)   The reallocation of a portion of the "Rental Value" to the "Labor for Dismantle Value" increased the leverage of Wing and Skanska to demand price concessions from Beeche Logistics at the completion of the Project.

201.)   Wing and Skanska knew when they requested the reallocation that they intended to demand price concessions from Beeche Logistics at the completion of the Project as a condition of payment to Beeche Logistics.

202.)   Wing in Massachusetts and Skanska in New York and New Jersey did not disclose to Beeche Logistics when the reallocation was negotiated and made that Wing and Skanska intended to demand price concessions from Beeche Logistics at the end of the Project.

203.)   The failure of Wing and Skanska to disclose their intentions to Beeche Logistics was in bad faith, unfair and deceptive.

204.)   Skanska as Construction Manager managed a Contractor Controlled Insurance Program (CCIP) for the benefit of Skanska, contractors and sub-contractors at the site to insure against the risks of loss to which Skanska, the contractors and sub-contractors on the Project were exposed.

205.)   The costs of the insurance was shared by the contractors and sub-contractors.

206.)   Had the CCIP not existed, the insurance costs of the individual contractors and sub-contractors on the project would have likely increased the individual contractor and sub-contractor bids and the total Project cost. The insured risks included property losses from

vandalism and extreme weather experienced by contractors and sub-contractors on the
Project.

### (e)        Contract Change Proposal 002.1:

207.)   On October 27, 2010, winder motors turned over and leased by Beeche Logistics to Wing
at the UN site were vandalized. The motors were utilized to raise and lower the scaffold
work platforms. (A true copy of an email dated 10/27/10 from Greg Beeche to William
Evans of Wing and Fredrick Jornlid of Skanska advising of the vandalism is attached as
Exhibit 25 to the Affidavit of Kirk Beeche.)

208.)   On October 27, 2010 Douglas Mains of Skanska instructed Greg Beeche of Beeche
Logistics by email to repair the motors. Wing also instructed Beeche Logistics to make
the repairs. (A true copy of an email dated 10/27/10 from Doug Maines of Skanska to
Greg Beeche of Beeche Logistics instructing Beeche Logistics to repair the motors is
attached as Exhibit 26 to the Affidavit of Kirk Beeche.)

209.)   On November 2, 2010 Greg Beeche by email to Michael Adams of Wing and Douglas
Mains of Skanska insisted that the cost of repair be agreed upon before Beeche Logistics
undertook the expense of making the repairs. (A true copy of an email by Kirk Beeche to
Mike Adams of Wing and Doug Maines of Skanska dated 11/2/10 is attached as Exhibit
27 to the Affidavit of Kirk Beeche.)

210.)   On November 2, 2010 the parties agreed on a price of $24,203 to perform the repair.
Beeche Logistics relied on the representations of Wing and Skanska to pay the cost of
repair and provided the labor and material requested.

211.)   On November 2, 2010 Beeche Logistics prepared **Contract Change Proposal 002.1** at

the negotiated price with Wing and Skanska of $24,203 for the repair of the motors. (A true copy of **Contract Change Proposal 002.1** with a Price Date of 11/2/10 is attached as Exhibit 28 to the Affidavit of Kirk Beeche.)

212.) On May 27, 2011 Daniel Kolakowski of Skanska represented by email to Greg Beeche that "**Skanska has submitted this cost ($24,203) as a claim under the project's CCIP policy. We have not heard back yet but if it is not accepted then Skanska intends to request that the UN authorize Skanska to pay for these costs out of Skanska's Contingency**." (A true copy of an email dated May 27, 2011 from Daniel Kolakowski of Skanska to Greg Beeche of Beeche Logistics is attached as Exhibit 12 to the Affidavit of Kirk Beeche.)

213.) On March 14, 2012 Lynn Shavelson, Esq. of Skanska advised counsel for Beeche Logistics by email that the claim was not covered by the CCIP because the scaffold was supposed to be insured by Beeche Logistics when the damage occurred under a separate policy.  (A true copy of the email dated 3/14/12 from Shavelson to Beeche Logistics is attached as Exhibit 29 to the Affidavit of Kirk Beeche.)

214.) Given that the scaffold system had been "turned over" by Beeche Logistics to the UN, Skanska, and Wing in October of 2010 before the vandalism, the risk of loss resided with Skanska as the administrator of the CCIP and Skanska as the entity that "controlled" site security.

**(f)      Contract Change Proposal 003.1:**

215.) In February of 2011 Fredrik Jornlid of Skanska in New York and New Jersey and Michael Adams of Wing in Massachusetts directed Beeche Logistics by email to design,

manufacture, ship, erect, and dismantle Powered Swing Stage Platforms suspended from

trolleys on monorails and move the monorails on three occasions after the system was

delivered to the site. (True copies of emails among Fredrik Jornlid of Skanska, Joseph

Anderson of Benson Global, and Kirk and Greg Beeche of Beeche Logistics dated 9/9-

10/11are attached hereto as Exhibit 30 to the Affidavit of Kirk Beeche.)

216.)    Beeche Logistics relied on the email representations of Wing in Massachusetts and

Skanska in New York and New Jersey that it would be paid an "extra" and provided the

labor and material requested.

217.)    On November 5, 2010 Beeche Logistics prepared **Contract Change Proposal 003.1** for

the design, manufacture, shipment, erection, and dismantle of Powered Swing Stage

Platforms suspended from trolleys on monorails at the negotiated price with Wing and

Skanska of $58,374 with costs for additional moves to be billed separately. The contract

performance dates of Beeche Logistics was extended six days. (A true copy of **Contract**

**Change Proposal 003.1** with a Price Date of 11/5/10 is attached as Exhibit 31 to the

Affidavit of Kirk Beeche.)

218.)    On May 11, 2011 Wing and Skanska approved the payment of $112,782.41 for the

equipment and the moves. (A true copy of the Wing Worksheet dated 5/11/11 is attached

as Exhibit 32 to the Affidavit of Kirk Beeche.)

219.)    On September 25, 2011 Wing in Massachusetts and Skanska in New York and New

Jersey by email approved **Contract Change Proposal 003.1** for the increased price of

$112,782 with the six day extension to compensate Beeche Logistics for both the

Powered Swing Stage Platforms and the labor provided by Beeche Logistics to move the

Swing Stage Platforms.

220.)   By mail erroneously dated September 26, 2010, Michael Adams confirmed to Kirk

Beeche that Skanska approved the payment of $112,782 to Beeche Logistics for

**Contract Change Proposal 003.1.** (A true copy of the letter and Wing worksheet edited

by Skanska from Mike Adams of Wing to Kirk Beeche of Beeche Logistics is attached as

Exhibit 33 to the Affidavit of Kirk Beeche.)

### (g)      Contract Change Proposal 004.1:

221.)   On November 5, 2010 Skanska and Wing in Massachusetts directed Beeche Logistics to

design, manufacture, ship, erect, and dismantle Powered Corner Basket Platforms

suspended from extensions to the primary platform roofs of Platforms 1, 10, 11 & 19. (A

true copy of **Contract Change Proposal 004.1** with a Price Date of 11/5/10 is attached

as Exhibit 34 to the Affidavit of Kirk Beeche.)

222.)   Beeche Logistics relied on the representations of Wing in Massachusetts and Skanska in

New York and New Jersey that it would be paid an "extra" and provided the labor and

material requested.

223.)   On November 12, 2010 Beeche Logistics prepared **Contract Change Proposal 004.1** for

the design, manufacture, shipment, erection, and dismantle of Powered Corner Basket

Platforms suspended from extensions to the primary platform roofs of Platforms 1, 10, 11

& 19 at the negotiated price with Wing and Skanska of $107,251. The contract

performance dates of Beeche Logistics were extended an additional eight days. (A true

copy of **Contract Change Proposal 004.1** with a Print Date of 11/12/10 is attached as

Exhibit 34 to the Affidavit of Kirk Beeche.)

224.) On April 14, 2011 Greg Beeche sent a letter to Mulcahey at Wing demanding payment in the amount of $107,251. (A true copy of the letter dated 4/14/11 is attached as Exhibit 35 to the Affidavit of Kirk Beeche.)

225.) On May 27, 2011 Daniel Kolakowski of Skanska advised Greg Beeche of Beeche Logistics by email that Skanska would authorize the payment of $56,722 for the "side baskets." (A true copy of the email dated 5/27/11 from Kolakowski to Greg Beeche is attached as Exhibit 12 to the Affidavit of Kirk Beeche.)

(h)     **Contract Change Proposals 005.1 and 006.1**:

226.) On November 22, 2010 Frederick Jornlid, Senior Project Manager for Skanska, directed by email Wing and Beeche Logistics to develop a system to secure the scaffolding platforms to the Secretariat Building when existing vertical mullions were removed by demolition crews. Those mullions were originally intended by Beeche Logistics to be available to secure the scaffolding platforms to the side of the structure to prevent wind damage. (A true copy of the email is attached as Exhibit 37 to the Affidavit of Kirk Beeche.)

227.) On November 23, 2010 Wing paid Beeche Logistics $182,691.90. There was no indication as to how the payment was calculated. The payment was due in September of 2010 and was late.

228.) On **November 25, 2010** Wing in Massachusetts drafted and transmitted by email Beeche Logistics **Application #10,** and Beeche Logistics in New York signed said **Application for Payment** under the Wing/Beeche Logistics Agreement in the additional amount of $121,318.61 with $3,116,667.23 completed and stored and retainage of $311,666.72 for

work completed through November 30, 2010. (A true copy of the **Application** is attached as Exhibit 36 to the Affidavit of Kirk Beeche.)

229.) **Application #10** did not include the Contract Change Proposals approved among Skanska, Wing, and Beeche Logistics. (A true copy of the **Application** is attached as Exhibit 42 to the Affidavit of Kirk Beeche.)

230.) On November 30, 2010 the Secretariat Building experienced unexpectedly high winds with gusts in excess of 30 miles per hour. The winds caused the scaffold platforms to be pushed against the Secretariat Building because the platforms were enclosed by large tarps in the "up" position which acted as sails catching the wind. The tarps were affixed to the five level scaffold platforms to protect workers at the Project and reduce the effect of wind on the interior of the structure after exterior windows and curtain wall were removed during demolition.

231.) Consistent with the Beeche Logistics letter to Wing dated September 1, 2010, it was standard practice for Beeche Logistics to roll up the tarps and reduce the windage when experiencing wind gusts in excess of 30 miles per hour. The practice reduced the risk of injury to workers and damage to the scaffolding and structure.

232.) On November 30, 2010 Beeche Logistics began to roll up the tarp enclosures to reduce windage and the risks of damage and personal injury. Notwithstanding, Fredrik Jornlid, Senior Project Manager for Skanska, directed the personnel of Beeche Logistics to cease their efforts at rolling up the tarps and instead deploy the tarps previously rolled up.

233.) Jornlid wanted to protect the interior of the Secretariat Building from the effects of the high winds. The attempts of Jornlid to protect the structure from wind damage by

utilizing the tarps in a manner that exceeded the performance characteristics of the scaffolding system resulted in the scaffold platforms being blown against the Secretariat structure - damaging  the tarps and platform rollers of the scaffolding platforms under lease from Beeche Logistics.

234.) Tom Bonfey of Beeche Logistics finally convinced Fredrik Jornlid of Skanska to desist in efforts to raise additional tarps to protect the interior structure of the Secretariat Building from wind damage at the risk of damaging scaffolding platforms and causing personal injury to workers at the Project. Beeche Logistics tried again to roll up the tarps but was unsuccessful due to the high winds and blowing scaffold platforms. Beeche Logistics employees then slashed some of the tarps to reduce wind pressure and reduce risk.

235.) As a result of the direction of Jornlid, the tarps and rollers affixed to the Beeche Logistics scaffolding systems were damaged. (True copies of emails dated 11/30/10 and 12/1/10 from Skanska describing what Skanska claimed occurred are attached as Exhibits 38 and 39 to the Affidavit of Kirk Beeche. A true copy of an email dated 6/1/11 from Greg Beeche to Skanska and Wing describing the events of 11/30/10 and 12/1/10 is attached as Exhibit 43 to the Affidavit of Kirk Beeche.)

236.) On December 1, 2010 Fredrik Jornlid, Senior Project Manager for Skanska, directed Beeche Logistics verbally and by email to replace the damaged tarps and rollers.  (A true copy of email dated 12/1/10 from Skanska to Beeche is attached as Exhibit 39 to the Affidavit of Kirk Beeche.)

237.) Beeche Logistics complied with the written and oral instructions of Wing in Massachusetts and Skanska in New Jersey and New York and provided the tarps, rollers,

labor and material requested. (True copies of emails dated December 30, 2010 among

Beeche, Wing and Skanska are attached as Exhibit 40 to the Affidavit of Kirk Beeche.)

238.)   The damage to the tarps and rollers on the scaffolding caused delays in the progress of

other trades working off that scaffolding pending the replacement of the tarps and rollers.

239.)   Michael Adams of Wing subsequently back charged Beech Logistics (Wing CO #16) by

letter (mistakenly dated September 26, 2010) in the amount of $23,229.29 for delays

allegedly caused to R. Baker & Son, another subcontractor of Wing, pending the repair of

the tarps and rollers.  (A true copy of the letter is attached as Exhibit 41 to the Affidavit

of Kirk Beeche.)

240.)   The back charge first appeared in **Application for Payment #20** prepared by Wing and

dated September 25, 2011. (A true copy of the **Application** is attached as Exhibit 42 to

the Affidavit of Kirk Beeche.)

241.)   On May 12, 2011 Beeche Logistics prepared a **Contract Change Proposal 05.1** in the

amount of $138,438 for the repair and replacement of platform enclosures ("tarps")

damaged by high winds in December of 2010 on the Secretariat Tower. The Proposal was

submitted for payment by Wing and Skanska with a breakdown of the work performed

justifying the amount of the extra based on time and materials. The contract performance

dates were extended twenty days. (A true copy of **Contract Change Proposal 05.1** is

attached as Exhibit 44 to the Affidavit of Kirk Beeche.)

242.)   On June 10, 2011 Beeche Logistics prepared a **Contract Change Proposal 06.1** in the

amount of $12,799 for the repair and replacement of bumper rollers damaged by high

winds  in December of 2010 on the Secretariat Tower. The Proposal was submitted for

payment by Wing and Skanska with a breakdown of the work performed justifying the amount of the extra based on time and materials. The contract performance date were extended twenty days. (A true copy of **Contract Change Proposal 06.1** is attached as Exhibit 45 to the Affidavit of Kirk Beeche.)

243.)   On May 27, 2011 Daniel Kolakowski for Skanska, advised Kirk Beeche of Beeche Logistics by email that Skanska was pursuing the tarp replacement costs as an insurance claim. (A true copy of the 10/27/11 email is attached as Exhibit 26 to the Affidavit of Kirk Beeche.)

244.)   Beeche Logistics was subsequently notified by Michael Adams of Wing by letter (mistakenly dated September 26, 2010) that Skanska rejected **Contract Change Proposal 05.1** because the damage to tarps should have been covered by insurance procured by Beeche Logistics separate and apart from the CCIP insurance procured by Beeche Logistics. (A true copy of the letter is attached as Exhibit 46 to the Affidavit of Kirk Beeche.)

245.)   Beeche Logistics was subsequently notified by Michael Adams of Wing by letter (mistakenly dated September 26, 2010) that Skanska rejected **Contract Change Proposal 06.1** because the damage to rollers should have been covered by insurance procured by Beeche Logistics separate and apart from the CCIP insurance procured by Beeche Logistics. (A true copy of the letter is attached as Exhibit 47 to the Affidavit of Kirk Beeche.)

246.)   The obligation of Beeche Logistics to procure insurance for tarps and rollers was allegedly found in part 1.6 of Exhibit "G-CCIP"of the Wing/Beeche Logistics Agreement

that required Beeche Logistics to insure leased equipment **"... stored off the Project site or in transit to the Project site ...."** Given that the damaged equipment was on the Project site hanging on the side of the Secretariat Building when the damage occurred, the rejection by Skanska of Contract Change Proposal 05.1 was in bad faith, unfair and deceptive.

247.) Although Skanska caused the damage to the tarps and rollers and Wing and Skanska required Beeche Logistics to replace the tarps and rollers, Wing and Skanska refused to pay for the extra labor and materials after the tarps and rollers were provided.

248.) On December 22, 2010 Wing paid Beeche Logistics $190,293.99. There was no indication as to how the payment was calculated. The payment was due in October 2010 and was late.

249.) On **December 25, 2010** Wing in Massachusetts drafted and sent by email to Beeche Logistics **Application #11,** and Beeche Logistics in New York signed said Application for Payment under the Wing/Beeche Logistics Agreement in the additional amount of $297,141.90 with $3,246,465.69 completed and stored and retainage of $162,323.28 for work completed through December 31, 2010. Skanska, Wing and Beeche Logistics agreed to reduce the retainage amount from 10% to 5% given the nature of the Wing/Beeche Logistics Agreement. (A true copy of the **Application** is attached as Exhibit 48 to the Affidavit of Kirk Beeche.)

250.) **Application #11** did not include the Contract Change Proposals previously approved among Skanska, Wing, and Beeche Logistics.

251.) On **January 25, 2011** Wing in Massachusetts drafted and sent by email to Beeche

Logistics **Application #12,** and Beeche Logistics in New York signed said Application

for Payment under the Wing/Beeche Logistics Agreement in the additional amount of

$110,154.08 with $3,362,417.35 completed and stored and retainage of $168,120.87 for

work through January 31, 2011. (A true copy of the **Application** is attached as Exhibit 49

to the Affidavit of Kirk Beeche.)

252.)   **Application #12** did not include the Contract Change Proposals previously approved

among Skanska, Wing,  and Beeche Logistics.

253.)   On February 8, 2011 Wing paid Beeche Logistics $123,308.54. The payment was late.

254.)   On **February 25, 2011** Wing in Massachusetts drafted and sent by email to Beeche

Logistics **Application #13,** and Beeche Logistics in New York signed said Application

for Payment under the Wing/Beeche Logistics Agreement in the additional amount of

$123,308.54 with $3,492,215.81 completed and stored and retainage of  $174,610.70 for

work through February 28, 2011. (A true copy of the **Application** is attached as Exhibit

50 to the Affidavit of Kirk Beeche.)

255.)   **Application #13** did not include the Contract Change Proposals previously approved

among Skanska, Wing, and Beeche Logistics.

256.)   On or about February 28, 2011 Beeche sent a letter to the Assistant Secretary of the

United Nations documenting the turn over of the scaffolding by Beeche Logistics to the

United Nations in October of 2010 - four months earlier. Thereafter, the Assist. Secretary

returned the Bill of Sale for the scaffolding dated March 19, 2010 to Beeche Logistics.

(A true copy of the Beeche letter dated 2/28/11 is attached as Exhibit 51 to the Affidavit

of Kirk Beeche.)

257.)  On March 1, 2011 Wing paid Beeche Logistics $155,633.36. There was no indication as to how the payment was calculated. The payment was late.

258.)  On **March 25, 2011** Wing in Massachusetts drafted and sent by email to Beeche Logistics **Application #14,** and Beeche Logistics in New York signed said Application for Payment under the Wing/Beeche Logistics Agreement in the additional amount of $123,308.54 with $3,662,014.27 completed and stored and retainage of  $181,100.71 for work through March 31, 2011. (A true copy of the **Application** is attached as Exhibit 52 to the Affidavit of Kirk Beeche.)

259.)  **Application #14** did not include the Contract Change Proposals approved among Skanska, Wing, and Beeche Logistics. It did include a back charge imposed by Wing upon Beeche Logistics and accepted by Beeche Logistics. It did not include any back charge for delays caused by Beeche Logistics.

260.)  On March 29, 2011 Wing paid Beeche Logistics $110,244. There was no indication as to how the payment was calculated. The payment was late.

261.)  On April 20, 2011 Wing paid Beeche Logistics $123,308.54. There was no indication as to how the payment was calculated. The payment was late and less than the amount due under **Application #14.**

262.)  On **April 25, 2011** Wing in Massachusetts drafted and sent by email to Beeche Logistics **Application #15,** and Beeche Logistics in New York signed said Application  for Payment under the Wing/Beeche Logistics Agreement in the additional amount of $123,308.54 with $3,918,314.13 completed and stored and retainage of  $174,610.70 for work performed through April 30, 2011. (A true copy of the **Application** is attached as

Exhibit 53 to the Affidavit of Kirk Beeche.)

263.) **Application #15** prepared by Wing included the Contract Change Proposals 01.1, 01.3, 01.4, and 01.5 approved among Skanska, Wing, and Beeche Logistics and a back charge to Beeche Logistics. The charge was initially imposed on Wing as an extra for labor performed by R. Baker, a subcontractor of Wing. Wing passed the charge on to Beeche Logistics, and it was accepted as a back charge by Beeche Logistics.  It did not include any back charge for delays caused by Beeche Logistics.

264.) **Application #15** reflected the acceptance by Wing and Skanska of a total of twenty-two extension days for the contract performance dates of Beeche Logistics.

265.) On May 18, 2011 Wing paid Beeche Logistics $123,308.54. There was no indication as to how the payment was calculated.

266.) On **May 25, 2011** Wing in Massachusetts drafted and sent by email to Beeche Logistics **Application #16,** and Beeche Logistics in New York signed said Application  for Payment under the Wing/Beeche Logistics Agreement in the additional amount of $123,308.54 with $4,048,112.59 completed and stored and retainage of  $202,405.63 for work through May 31, 2011. (A true copy of the **Application** is attached as Exhibit 58 to the Affidavit of Kirk Beeche.)

267.) **Application #16** prepared by Wing included the Contract Change Proposals 01.1, 01.3, 01.4, and 01.5 approved among Skanska, Wing, and Beeche Logistics and a back charge imposed by Wing on Beeche and accepted by Beeche Logistics.  It did not include any back charge for delays caused by Beeche Logistics.

268.) On May 27, 2011 Skanska confirmed by email to Beeche Logistics that Skanska **did not**

intend to claim any delays caused by Beeche Logistics in the delivery and installation of the scaffold systems. (A true copy of the email is attached as Exhibit 26 to the Affidavit of Kirk Beeche.)

### (i)    Additional Quadrant Moves:

269.)   On June 7, 2011 Daniel Kolakowski, Senior Vice President of Skanska, confirmed by email to Kirk and Greg Beeche of Beeche Logistics that "Skanska and Wing agree to pay GBL $116,375 for the required 7 '**additional quadrant moves**' as you have so clearly requested below." The "**additional quadrant moves**" of the scaffolding were not covered in the base contract. (A true copy of the 6/7/11 email is attached as Exhibit 55 to the Affidavit of Kirk Beeche.)

270.)   When Kolakowski made that representation, he knew it was not true and intended Beeche Logistics to rely thereon.

271.)   Beeche Logistics relied on the representation of Skanska and provided the extra labor and materials requested for the "**additional quadrant moves**."

272.)   On September 25, 2011 Skanska breached its June 7, 2011 agreement to pay $116,375 for seven quadrants of "**additional quadrant moves**" beyond those covered by the base agreement and approved the payment of only $80,564 for those moves. The refusal of Skanska to pay the $116,375 was communicated by Michael Adams of Wing to Kirk Beeche of Beeche Logistics by email dated erroneously September 26, 2010. (A true copy of the Wing email is attached as Exhibit 56 to the Affidavit of Kirk Beeche.)

273.)   On June 28, 2011 Wing paid Beeche Logistics $281,484.87. There was no indication as to how the payment was calculated. The payment was late.

274.) On **June 25, 2011** Wing in Massachusetts drafted and sent by email Beeche Logistics

**Application #17,** and Beeche Logistics in New York signed said Application  for

Payment under the Wing/Beeche Logistics Agreement in the additional amount of

$223,411.94 with $4,283,283.05 completed and stored and retainage of  $214,164.15 for

work through June 30, 2011. (A true copy of the **Application** is attached as Exhibit 57 to

the Affidavit of Kirk Beeche.)

275**.)** **Application #17** prepared by Wing included the Contract Change Proposals 01.1, 01.3,

01.4, 01.5 and 04.1 approved among Skanska, Wing, and Beeche Logistics and a back

charge imposed by Wing on Beeche Logistics and accepted by Beeche Logistics.  It did

not include an extra of $116,375 for "additional platform moves" or any back charge for

delays caused by Beeche Logistics.

276.) **Application #17** reflected the acceptance by Wing and Skanska of a total of thirty

extension days for the benefit of Beeche Logistics in the performance of the

Wing/Beeche Agreement.

**(j)** **Contract Change Proposal 007.1:**

277.) On or about June 15, 2011 Skanska and Wing in Massachusetts instructed Beeche

Logistics to provide a supervisor for the Project for rigging at night. (A true copy of

**Contract Change Proposal 007.1** with a Price Date of 6/15/11 is attached as Exhibit 58

to the Affidavit of Kirk Beeche.)

278.) Beeche Logistics relied on the email representations of Wing in Massachusetts and

Skanska in New York and New Jersey that it would be paid an "extra" and provided the

labor and material requested.

279.) On July 19, 2011 Beeche Logistics prepared a **Contract Change Proposal 007.1** in the amount of $34,299 for the provision of a supervisor for rigging at night at the request of Wing and Skanska. The Proposal was submitted for payment by Wing and Skanska with a breakdown of the work performed justifying the amount of the extra based on time and materials. The contract performance dates for Beeche Logistics were extended twenty days.  (A true copy of **Contract Change Proposal 007.1** with a Print Date of 7/19/11 is attached as Exhibit 58 to the Affidavit of Kirk Beeche.)

280.) On July 25, 2011 Wing and Skanska approved  **Contract Change Proposal 007.1** in the amount of $34,810 with the twenty day extension by including the payment in **Application for Payment #18** at page 2 as Item #20 CO#7 "Night Time Rigger" drafted by Wing and approved by Skanska. (A true copy of **Application for Payment #18** dated 7/25/11 is attached as Exhibit 59 to the Affidavit of Kirk Beeche.)

281.) On July 25, 2011 Wing in Massachusetts drafted sent by email to Beeche Logistics **Application #18,** and Beeche Logistics in New York signed said Application  for Payment under the Wing/Beeche Logistics Agreement in the additional amount of $312,506.17 with $4,612,236.91 completed and stored and retainage of  $230,611.85 for work through July 31, 2011. (A true copy of **Application for Payment #18** dated 7/25/11 is attached as Exhibit 59 to the Affidavit of Kirk Beeche.)

282**.)** **Application #18** prepared by Wing included the Contract Change Proposals 01.1, 01.3, 01.4, 01.5, 04.1 and 07.1 approved among Skanska, Wing, and Beeche Logistics and a back charge imposed by Wing on Beeche Logistics and accepted by Beeche Logistics.  It did not include any back charge for delays caused by Beeche Logistics.

283.) **Application #18** reflected the acceptance by Wing and Skanska of a total of fifty extension days for the benefit of Beeche Logistics in the performance of the Wing/Beeche Agreement.

284.) On July 26, 2011 Wing paid Beeche Logistics $123,308.54. There was no indication as to how the payment was calculated.

285.) On August 23, 2011 Wing paid Beeche Logistics $223,411.94. There was no indication as to how the payment was calculated.

286.) On **August 25, 2011** Wing in Massachusetts drafted and sent by email to Beeche Logistics **Application #19,** and Beeche Logistics in New York signed said Application for Payment under the Wing/Beeche Logistics Agreement in the additional amount of $285,354.79 with $4,912,610.37 completed and stored and retainage of $245,630.52 for work through August 31, 2011. (A true copy of **Application for Payment #19** dated 8/25/11 is attached as Exhibit 60 to the Affidavit of Kirk Beeche.)

287.) **Application #19** prepared by Wing included the Contract Change Proposals 01.1, 01.3, 01.4, 01.5, 04.1 and 07.1 approved among Skanska, Wing, and Beeche Logistics and a back charge imposed by Wing on Beeche and accepted by Beeche Logistics. It did not include any back charge for delays caused by Beeche Logistics.

288.) **Application #19** reflected the acceptance by Wing and Skanska of a total of fifty extension days for the contract performance dates of Beeche Logistics.

289.) On **September 25, 2011** Wing in Massachusetts drafted and sent by email to Beeche Logistics **Application #20**. (A true copy of **Application for Payment #20** dated 9/25/11 is attached as Exhibit 42 to the Affidavit of Kirk Beeche.)

290.) **Application #20** prepared by Wing included the Contract Change Proposals 01.1, 01.3, 01.4, 01.5, 03.1, 04.1, 07.1 and the payment for additional platform moves approved among Skanska, Wing, and Beeche Logistics.

291.) Wing also back charged Beeche Logistics for six items, four of which were allegedly for delays valued at $136,551.14 in delivering and installing the scaffold systems for which Beeche Logistics denied liability. The back charge was communicated to Beeche Logistics by email.

292.) **Beeche Logistics** refused to execute **Application #20** prepared by Wing.

293.) Beeche Logistics submitted to Wing and Skanska its own version of **Application #20** dated September 25, 2011 which valued the additional moves at the previously agreed extra of $116,375 and deleted the rejected back charges proposed by Wing. (A true copy of the Beeche Logistics version of **Application for Payment #20** dated 9/25/11 is attached as Exhibit 61 to the Affidavit of Kirk Beeche.)

294.) **Application #20** reflected the acceptance by Wing and Skanska of a total of fifty-six extension days for the contract performance dates of Beeche Logistics.

295.) The delay claim of Wing was unwarranted. The roof of the Secretariat Building was first ready to receive the scaffold towers on July 29, 2010. All of the scaffold systems had been turned over to the United Nations and Wing between July 29, 2010 and October 24, 2010 - a period of 87 days. The Wing/Beeche Logistics Agreement allowed Beeche Logistics 42 days to mobilize. As of September 25, 2011 the change orders approved by Wing and Skanska had extended another fifty days for mobilization for a total period of 92 days. The scaffolds were turned over to the United Nations and Wing within the 92

day period. Indeed, as discussed hereafter, additional extension days were approved by Wing and Skanska after September 25, 2011.

296.) On September 27, 2011 Wing paid Beeche Logistics $312,506.17. There was no indication as to how the payment was calculated.

### (k)   Additional Rental:

297.) On October 20, 2011 Beeche Logistics entered into negotiations with Wing for additional rental due beyond the twelve month lease period in the total amount of $256,500 for the scaffold systems on each of the four quadrants. **The negotiated numbers were subsequently designated as CO #s 22, 23, 24, and 25 on the Continuation Sheets attached to Applications for Payment prepared and submitted by Beeche Logistics to Wing**. The negotiation was memorialized by a letter dated October 20, 2011 sent from Beeche Logistics to Wing.

298.) Beeche Logistics prepared and forwarded **Application #21** dated **October 25, 2011** to Wing and Skanska. The Application for Payment sought a payment of $413,437.09 with $5,538,779 completed and stored and retainage of $138,469.48 for work performed through October 31, 2011. (A true copy of the Beeche version of **Application for Payment #21** dated 10/25/11 is attached as Exhibit 62 to the Affidavit of Kirk Beeche.)

299.) **Application #21** prepared by Beech Logistics included the Contract Change Proposals and change orders valued at $919,888.61 agreed among Skanska, Wing, and Beeche Logistics.

300.) Wing in Massachusetts rejected by **Application#21** prepared by Beeche Logistics and prepared its own version of **Application #21.** The Wing version sought a payment to

Beeche Logistics of $126,820.30 with $5,311,421 completed and stored and retainage of $126,820.30. (A true copy of the Wing version of **Application for Payment #21** dated 10/25/11 is attached as Exhibit 63 to the Affidavit of Kirk Beeche.)

301.) The Wing version rejected change orders identified by Beeche Logistics and advanced back charges rejected by Beeche Logistics.

302.) On November 20, 2011 Beeche Logistics gave Wing a Notice of Dispute and executed a Conditional Release of Claims accepting the proposed payment by Wing but reserving its rights to contest the difference. This procedure was "recognized" in the Skanska/Wing Agreement but not necessarily adopted as part of the Skanska/Wing Agreement due to inconsistencies and incompatibilities of language and terms.

303.) Beeche Logistics prepared and forwarded by private carrier or United States mail **Application #21A** dated **November 25, 2011**  to Wing and Skanska. The Application for Payment sought a payment of $74,100 with $5,614,779 completed and stored and retainage of $140,369.48. (A true copy of **Application for Payment #21** dated 11/25/11 is attached as Exhibit 64 to the Affidavit of Kirk Beeche.)

304.) **Application #21A** prepared by Beech Logistics included the Contract Change Proposals and change orders valued at $919,888.61 agreed among Skanska, Wing, and Beeche Logistics, many of which were also approved by the United Nations.

305.) On December 8, 2011 Wing paid Beeche Logistics $152,191.69. There was no indication as to how the payment was calculated.

### (l)      Removal of Scaffold Systems from Structure:

306.) On December 13, 2011 Beeche Logistics advised Wing in writing and with photographs

that the scaffold towers could not be removed from the roof of the Secretariat Building because the towers could not be rolled back from the perimeter of the roof and disassembled. Materials for which third parties were responsible obstructed the movement to the towers and their disassembly, and the surface of the roof was obstructed with fastened tie back anchors and monorails. Further, the towers could not be rolled over the surface of the roof because of open spaces in the roof and missing roof tiles. Sheets of plywood staged by Beeche Logistics at the United Nations to be used for the demobilization were missing.

307.)   Beeche Logistics completed approximately a third of the dismantling and removal of the leased equipment in December of 2011.

308.)   Beeche Logistics prepared and forwarded **Application #22** dated **December 25, 2011** to Wing and Skanska. The Application  for Payment sought a payment of $169,717 with $5,788,848 completed and stored and retainage of $144,721.21 for work through December 31, 2011. (A true copy of **Application for Payment #22** dated 12/25/11 is attached as Exhibit 65 to the Affidavit of Kirk Beeche.)

309.)   **Application #22** prepared by Beech Logistics included the Contract Change Proposals and change orders valued at $938,961.61 agreed among Skanska, Wing, and Beeche Logistics.

310.)   On January 1, 2012 Greg Beeche repeated his prior requests to Wing to provide the missing copies of the Skanska/Wing Agreement and copies of the payment and performance bonds posted by Wing per the Bid Documents.

311.)   On January 2, 2012 Greg Beeche was advised by Wing for the first time by email that

<u>Wing had posted no payment or performance bonds for the UN Project</u>. Wing reported that it had again requested copies of the contracts from Skanska to be provided to Beeche Logistics. (A true copy of the email from Wing is attached as Exhibit 66 to the Affidavit of Kirk Beeche.)

312.) The failure of both Wing and Skanska to disclose to Beeche Logistics prior to the execution by Beeche Logistics of the Wing/Beeche Logistics Agreement that Wing was not required by Skanska to post payment and performance bonds was material and in bad faith, unfair and deceptive.

313.) On January 5, 2012 Beeche Logistics sent a letter to Wing and Skanska contesting the back charges for delay damages asserted by Wing. Beeche Logistics demanded mediation regarding the disputed items in the Beeche Logistics **Application #20** for work performed through October 30, 2011. Although not applicable to the Wing/Beeche Logistics Agreement, the Skanska/Wing Agreement incorporated by reference a dispute resolution protocol in the Construction Management Agreement between the United Nations and Skanska that mandated mediation. (A true copy of the letter is attached as Exhibit 67 to the Affidavit of Kirk Beeche.)

314.) On January 11, 2012 Wing paid Beeche Logistics $126,820.30.

315.) On January 13, 2012 counsel for Beeche Logistics requested from Skanska a copy of the Construction Management Agreement with Exhibits, a copy of the Skanska/Wing Agreement with Exhibits, and a copy of the Dispute Log allegedly kept by Skanska pursuant to Section 1.4.2 of the Construction Management Agreement.

316.) On January 22, 2012 Wing in Massachusetts advised Beeche Logistics by email that no

money was due Beeche Logistics under Application 21A for work completed through November 30, 2012.

317.)    The refusal of Wing to pay monies due Beeche Logistics under Application 21A was in bad faith, unfair and deceptive.

318.)    Beeche Logistics completed the removal of the leased equipment in January of 2012.

319.)    Beeche Logistics prepared and forwarded **Application #23** dated **January 25, 2012 to** Wing and Skanska. The Application  for Payment sought a payment of $148,707.78 with $5,941,369.20 completed and stored and retainage of $148,534.23 for work through January 31, 2012. (A true copy of **Application for Payment #23** dated 1/25/12 is attached as Exhibit 68 to the Affidavit of Kirk Beeche.)

320.)    **Application #23** prepared by Beech Logistics included the Contract Change Proposals and change orders valued at $941,369.61 agreed among Skanska, Wing, and Beeche Logistics.

321.)    On January 25, 2012 counsel for Skanska advised counsel for Beeche Logistics by letter that Skanska had no duty to mediate disputes regarding back charges and claims for extras between Wing to Beeche Logistics. Further, the Skanska/Wing Agreement required Wing to maintain insurance to cover the risks of loss associated with the tarp and roller damages. Skanska had already paid Wing $80,500 for additional scaffolding moves from which Beeche Logistics had made claims. The excess claim of $35,811 was "between" Wing and Beeche Logistics. Skanska offered to pay Wing $70,000 as extended rental for the scaffolding system for the period the scaffolding was stranded on the roof of the Secretariat Building when the lease expired. Claims of Beeche Logistics

for damages caused to tarps, bumper rollers and winder motors under the CCIP were not

covered. (A true copy of the letter is attached as Exhibit 69 to the Affidavit of Kirk

Beeche.)

322..) To the extent that the Wing/Beeche Logistics Agreement incorporated by reference a

dispute resolution protocol regarding mediation and arbitration contained in another

Agreement that involved Skanska, Skanska repudiated that protocol.

323.) If the mediation and arbitration protocol had been incorporated and did as a matter of law

apply to Beeche Logistics, the repudiation of Skanska's duty to mediate/arbitrate was in

bad faith, unfair and deceptive.

324.) The failure of Wing to forward the monies received from Skanska due Beeche Logistics

was in bad faith, unfair, deceptive and/or in breach of trust.

325.) On January 25, 2012 counsel for Beeche Logistics demanded copies of the CCIP policies,

claim documents and denials.

326.) On January 28, 2012 Wing in Massachusetts notified Beeche Logistics by mail alleging

that Wing was delayed between July 26, 2010 and October 26, 2010 before all of the

scaffolds were turned over to the United Nations. Although Wing prepared Applications

for Payment that recognized and acknowledge approval for fifty extension days

beginning July 26, 2010, Wing denied that the extensions had been granted. (A true copy

of the correspondence is attached as Exhibit 70 to the Affidavit of Kirk Beeche.)

327.) On February 6, 2012 Skanska provided Beeche Logistics by email with a copy of the

CCIP policy and advised Beeche Logistics that the insurance claims of Beeche Logistics

under the CCIP policy were rejected. (A true copy of the email is attached as Exhibit 72

to the Affidavit of Kirk Beeche.)

328.) The rejection by Skanska of the insurance claims of Beeche Logistics was in bad faith, deceptive and an unfair insurance practice.

329.) On February 10, 2012 Wing in Massachusetts sent Beeche Logistics in New York by private carrier or United States mail fourteen "change order forms" to be executed by Beeche Logistics and submitted for approval by Wing to Skanska. The forms required Beeche Logistics to waive its previously recognized extensions and accept monies for extra work in amounts less than previously agreed and, in some instances, already paid by Skanska to Wing. (A true copy of the email with forms is attached as Exhibit 71 to the Affidavit of Kirk Beeche.)

330.) The change order forms provided by Wing to Beeche Logistics were not consistent with sample forms contained in the Bid Documents.

331.) The refusal to pay by Wing was in bad faith, unfair and deceptive.

332.) Beeche Logistics declined to execute the Wing "Change Order" forms on February 17, 2012 through its counsel and advised Skanska of the improper conduct of Wing.

333.) There was no requirement in the Wing/Beeche Logistics Agreement to execute the forms provided by Wing to Beeche Logistics on February 10, 2012.

334.) The presentation of the "change order forms" by Wing in Massachusetts and the demand that they be executed by Beeche Logistics was in bad faith, unfair and deceptive.

335.) On February 17, 2012 Greg Beeche of Beeche Logistics by email to Daniel Kolakowski reminded him of Skanska's initial offer to issue joint checks to Wing and Beeche Logistics or have Skanska pay Beeche Logistics "in any case." Beeche asked Kolakowski

to assist Beeche Logistics in getting paid by Wing. (A true copy of the email is attached as Exhibit 73 to the Affidavit of Kirk Beeche.) Greg Beeche sent a further email to Kolakowski on May 7, 2012 repeating the request. (A true copy of the email is attached as Exhibit 74 to the Affidavit of Kirk Beeche.)

336.) Thereafter, Skanska did not issue joint checks payable to Wing and Beeche Logistics or cause Beeche Logistics to be paid by Skanska "in any case," despite the prior representations of Daniel Kolakowski that he would do so and the reliance of Beeche Logistics upon those representations.

337.) The refusal of Skanska to issue joint checks in conjunction with: a.) the immunity of the United Nations from civil process and New York Lien Law and b.) the failure of Skanska to have advised Beeche Logistics prior to the execution of the Wing/Beeche Logistics Agreement that Skanska had waived the requirement that Wing post payment and performance bonds was in bad faith, unfair and deceptive.

338.) In March of 2012 Beeche Logistics repeatedly sought the assistance of Skanska to mediate the disputes between Wing and Beeche Logistics.

339.) On March 9, 2012 Daniel Kolakowski of Skanska acknowledged by email that he was unable to find common ground between Wing and Beeche Logistics, and on March 14, 2012 Beeche Logistics was advised by email that Skanska had no obligation to mediate the dispute.

340.) To the extent that the Wing/Beeche Logistics Agreement incorporated by reference a dispute resolution protocol regarding mediation and arbitration contained in another Agreement that involved Skanska, Skanska repudiated that protocol.

341.)   To the extent that Skanska wrongfully repudiated that protocol, the actions of Skanska were in bad faith, unfair and deceptive.

342.)   On April 11, 2012 Daniel Kolakowski of Skanska acknowledged by email that Skanska had paid Wing $95,546.49 on March 1, 2012 and $137,097.48 on March 20, 2012 for labor and materials provided by Beeche Logistics. (A true copy of the email is attached as Exhibit 75 to the Affidavit of Kirk Beeche.)

343.)   The failure of Wing to forward the monies received from Skanska due Beeche Logistics was in bad faith, unfair, deceptive and/or in breach of trust.

344.)   By paying the money due Beeche Logistics to Wing, Skanska ratified the wrongful conduct of Wing when Wing demanded that Beeche Logistics execute the Wing Change Orders waiving the contract extensions to Beeche Logistics, accepting inadequate payments for extras, and requiring Beeche Logistics to accept Wing backcharges. Further, Skanska "increased the leverage" of Wing to compel the execution of the Wing Change Orders by Beeche Logistics and/or compel improper price concessions.

345.)   The payment by Skanska of monies due Beeche Logistics to Wing a.) with the knowledge that Wing had refused to pay Beeche Logistics unless Beeche Logistics executed the Wing Change Orders and b.) in the absence of releases executed by Beeche Logistics was in bad faith, unfair and deceptive.

### (m)   Contract Change Proposals 008.1 and 009.1:

346.)   On or before July 3, 2011 Skanska and Wing instructed Beeche Logistics to provide a supervisor for rigging at night for the periods 7/3/11 through 9/2/11 and 12/17/11 through 1/24/12. (A true copy of **Contract Change Proposal 008.1** with a Price Date of 1/16/12

is attached as Exhibit 76 to the Affidavit of Kirk Beeche.)

347.)   Beeche Logistics relied on the representations by email of Wing in Massachusetts and

Skanska in New York and New Jersey that it would be paid an "extra" and provided the

labor and material requested.

348.)   On May 7, 2012 Beeche Logistics prepared a **Contract Change Proposal 008.1** in the

amount of $21,198 for the provision of a supervisor for rigging at night for the period

7/3/11 through 9/2/11 at the request of Wing and Skanska. The Proposal was submitted

for payment by Wing and Skanska with a breakdown of the work performed justifying

the amount of the extra based on time and materials. The contract performance date was

extended twenty days. (A true copy of **Contract Change Proposal 008.1** with a Print

Date of 4/6/12 is attached as Exhibit 76 to the Affidavit of Kirk Beeche.)

349.)   **Contract Change Proposal 008.1** has not been rejected or approved by Skanska and

Wing.

350.)   On or before December 17, 2011 Skanska and Wing instructed Beeche Logistics to

provide labor for removal of the scaffold systems at night for the period 12/17/11 through

1/24/12. (A true copy of **Contract Change Proposal 009.1** with a Price Date of 1/16/12

is attached as Exhibit 77 to the Affidavit of Kirk Beeche.)

351.)   On May 7, 2012 Beeche Logistics prepared a **Contract Change Proposal 009.1** in the

amount of $2,408 for the provision of a supervisor for rigging at night for the period

12/17/11 through 1/24/12 at the request of Wing and Skanska. The Proposal was

submitted for payment by Wing and Skanska with a breakdown of the work performed

justifying the amount of the extra based on time and materials. The contract performance

date was extended twenty days. (A true copy of **Contract Change Proposal 009.1** with a Print Date of 4/6/12 is attached as Exhibit 77 to the Affidavit of Kirk Beeche.)

352.) **Contract Change Proposal 09.1** has not been rejected or approved by Skanska and Wing.

353.) The delays of Wing in Massachusetts and Skanska in New York and New Jersey in approving the pending Contract Change Proposals of Beeche Logistics were in bad faith, unfair and deceptive.

354.) Beeche Logistics prepared and forwarded **Application #24** dated **February 25, 2012** to Wing. The Application for Payment sought a payment of $148,707.78 with $5,941,369.20 completed and stored and retainage of $0 for work through February 29, 2012. (A true copy of the Application is attached as Exhibit 78 to the Affidavit of Kirk Beeche.)

355.) **This was the final Application**.

356.) **Application #24** prepared by Beech Logistics included the Contract Change Proposals and change orders valued at $941,369.61 agreed among Skanska, Wing, and Beeche Logistics.

357.) On multiple occasions, Wing requested extra work to be performed by Beeche Logistics knowing that the extra work request had not been approved by Skanska and/or would not be paid by either Skanska or Wing.

358.) Notwithstanding, Wing requested the extra work from Beeche Logistics without disclosing to Beeche Logistics the absence of payment approvals and/or intent to pay by either or both Skanska and Wing.

359.)   Wing requested the extra work to be performed by Beeche Logistics with knowledge of the possibility that Beeche Logistics would not have a Contract Change Proposal approved for the extra work after it was performed by Beeche Logistics. Wing concealed this information from Beeche Logistics in bad faith, unfairly and deceptively.

360.)   Wing in Massachusetts failed and refused to submit Applications for Payment prepared by Beeche Logistics to Skanska for payment.

361.)   The failure of Wing to submit the Applications for Payment prepared by Beeche Logistics for approval by Skanska was in concert with Skanska.

362.)   Skanska failed and refused to submit one or more Contract Change Proposals prepared by Beeche Logistics for approval by the United Nations.

363.)   The failure and refusal of Skanska to submit one or more Contract Change Proposals prepared by Beeche Logistics for approval by the United Nations was in concert with Wing.

364.)   The failure and refusal of Wing to submit the Applications for Payment prepared by Beeche Logistics to Skanska for payment was in bad faith, unfair and deceptive.

365.)   Skanska failed and refused to pay Wing for the benefit of Beeche Logistics the amounts shown on the Applications for Payment prepared by Beeche Logistics.

366.)   The statements by Skanska communicated to Wing in Massachusetts of requests that Beeche Logistics perform additional work and the representations by Skanska to Wing that Skanska would pay Wing for the extra work performed by Beeche Logistics were intended by Skanska to be communicated to Beeche Logistics as a "known party" entitled to rely on the statements and representations of Skanska. Beeche Logistics, Skanska and

Wing knew that Wing required the assent of Skanska to engage Beeche Logistics to perform extra work and the commitment of Skanska to pay Wing (and thereby Beeche Logistics) for extra work if performed. *See* <u>Sykes v. RFD Third Avenue 1 Associates, LLC</u>, 15 N.Y.3d 370, 938 N.E.2d 325 (2010)

367.)   The failure and refusal of Wing and Skanska to pay the Applications for Payment prepared by Beeche Logistics was in concert and in bad faith.

368.)   Beeche Logistics provided goods and services to the United Nations Project less approved back charges with an agreed net value of $5,941,369.61. (A true copy of a summary is attached hereto as Exhibit 79)

369.)   Beeche Logistics was paid by Wing a total of $4,945,881.78 through January 11, 2011. (A summary of payments is attached hereto as Exhibit 80.)          .

370.)   As of May 23, 2012, Beeche Logistics was owed $995,377.44. (A summary of unpaid charges is attached hereto as Exhibit 81)

371.)   Neither Skanska nor Wing disputed the obligation to pay Beeche Logistics the sum of $365,429.50.

372.)   The failure and refusal of Skanska and Wing to pay Beeche Logistics the sum of $995,377.44 was in bad faith, unfair and deceptive.

373.)   The failure and refusal of Skanska and Wing to pay Beeche Logistics the sum of $365,429.50 was in bad faith, unfair and deceptive.

374.)   The failure and refusal of Skanska and Wing to pay Beeche Logistics for approved change orders was in bad faith, unfair and deceptive.

**COUNT I**      <u>(Breach of Contract - New York Law - Wing/Skanska)</u>:

375.)   Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.) through 374.)

376.)   Wing and Skanska breached the express and implied covenants in the Wing/Beeche Logistics Agreement.

377.)   Wing and Skanska breached the express and implied covenants in the fifteen change orders between Wing and Beeche Logistics pertaining to the payment to Beeche Logistics for extra work.

378.)   Skanska breached its agreement with Beeche Logistics to issue joint checks to Wing and Beeche Logistics upon the request of Beeche Logistics.

379.)   Skanska breached its obligations under the CCIP to pay Beeche Logistics for insured losses under the CCIP.

380.)   Beeche Logistics was damaged by the breach of the express and implied covenants in the Wing/Beeche Logistics Agreement in the amount of $995,377.44.

381.)   Beeche Logistics was damaged by the breach of the promise of Skanska to issue joint checks to Wing and Beeche Logistics upon the request of Beeche Logistics in the amount of $995,377.44.

382.)   Wing and Skanska are jointly and severally liable to Beeche Logistics for the damages.

**COUNT II**   (Quantum Meruit/Unjust Enrichment - New York Law - Wing/Skanska):

383.)   Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.) through 374.)

384.)   The fair and reasonable value of the goods and services provided by Beeche Logistics to Wing and Skanska was $5,941,369.61.

385.) The amount paid by Wing to Beeche Logistics was $4,945,881.78.

386.) To the extent that the Wing/Beeche Logistics Agreement and/or the change orders between Wing and Beeche Logistics are not binding or void, New York State recognizes causes of action for quantum meruit and unjust enrichment. Clark-Fitzpatrick, Inc. v. Long Is. R. R. Co., 70 N.Y.2d 382, 388 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); Goldstein v. CIBC World Markets Corp., 6 AD3d 295, 296 (1st Dept. 2004)("A claim for unjust enrichment, or quasi contract, may not be maintained where a contract exists between the parties covering the same subject matter.")

387.) The measure of damages in the State of New York is the same for causes of action for quantum meruit and unjust enrichment.

388.) Wing and Skanska will be unjustly enriched if Beeche Logistics is not paid for the fair and reasonable value of the labor and materials it provided to Wing and Skanska.

389.) The amount remaining due Beeche Logistics for the fair and reasonable value of its services under the doctrine of quantum meruit is $995,377.44.

390.) The amount remaining due Beeche Logistics for the fair and reasonable value of its services under the doctrine of unjust enrichment is $995,377.44.

391.) Beeche Logistics has sustained damages in the amount of $995,377.44.

392.) Wing and Skanska are jointly and severally liable to Beeche Logistics for the damages.

**COUNT III**   (Promissory Estoppel - New York Law - Wing/Skanska):

393.) Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.)

through 374.)

394.)   The New York State common law recognizes a cause of action for promissory estoppel.

395.)   Wing repeatedly represented to Beeche Logistics that it would pay Beeche Logistics for the work under the Wing/Beeche Agreement and the fifteen change orders requested by Wing knowing that Beeche Logistics would rely on those representations.

396.)   Skanska represented to Beeche Logistics that it would issue joint checks to Wing and Beeche Logistics if requested by Beeche Logistics.

397.)   Beeche Logistics relied on the representations of Wing that Wing and Skanska would pay Beeche Logistics for the work requested by Wing as approved by Skanska.

398.)   Beeche Logistics provided the labor and material requested by Wing as approved by Skanska.

399.)   Wing and Skanska represented to Beeche Logistics that it would be insured against the risk of loss to rented equipment damaged after being delivered to the Project site.

400.)   Beeche Logistics relied upon the representations that its equipment would be insured against property damage under the CCIP..

401.)   Wing and Skanska are estopped to deny that Beeche Logistics is due $995,377.44 for providing the labor and materials requested by Wing and Skanska.

402.)   Wing and Skanska are estopped to deny that Beeche Logistics was covered under the CCIP for damage to rented equipment delivered to the Project site.

403.)   Beeche Logistics has sustained damages in the amount of $995,377.44.

404.)   Wing and Skanska are jointly and severally liable to Beeche Logistics for the damages.

**COUNT IV**   (<u>Intentional Misrepresentation - New York Law - Wing/Skanska</u>):

405.)  Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.) through 374.)

406.)  Under New York law, there is a cause of action for intentional misrepresentation if there is an intentional misrepresentation of a material fact that results in injury. Held v. Kaufman, 91 N.Y.2d 425, 694 N.E.2d 430 (1998).

407.)  Wing and Skanska concealed the immunity of the United Nations to liens and civil process from Beeche Logistics.

408.)  Wing and Skanska knew that the ability of Beeche Logistics to secure payment from the United Nations utilizing civil process was material to Beeche Logistics.

409.)  Wing and Skanska concealed the financial weakness of Wing when Skanska asked Beeche Logistics to become a subcontractor of Wing.

410.)  Wing and Skanska knew that the financial condition of Wing was material to Beeche Logistics.

411.)  Wing and Skanska concealed from Beeche Logistics the material information that Wing did not post a payment or performance bond to secure payment to Beeche Logistics for labor and materials supplied to the Project.

412.)  Wing and Skanska knew that the failure of Wing to post payment and performance bonds was material to Beeche Logistics.

413.)  Skanska represented to Beeche Logistics that it would issue joint checks to Wing and Beeche Logistics if requested by Beeche Logistics to secure payment.

414.)  Skanska knew that the representation of Skanska to issue joint checks was material to Beeche Logistics and that Beeche Logistics would rely thereon.

415.) Wing and Skanska represented to Beeche Logistics that the leased equipment was insured under the CCIP program against damage while on the Project.

416.) Wing and Skanska knew that the representation by Wing and Skanska was material to Beeche Logistics and that Beeche Logistics would rely thereon.

417.) Wing and Skanska represented to Beeche Logistics that the leased equipment was insured under the CCIP program against damage while on the Project knowing that Beeche Logistics would rely on the representation.

418.) Beeche Logistics relied on the representation of Wing and Skanska, did not include the cost of procuring its own insurance in the Wing/Beeche Logistics Agreement, and did not procure its own insurance coverage separate and apart from the CCIP.

419.) Wing and Skanska expressly and impliedly represented to Beeche Logistics on multiple occasions that Beeche Logistics would be paid for the work requested by Wing as approved by Skanska under the Wing/Beeche Logistics Agreement and the above referenced fifteen change orders.

420.) Wing and Skanksa knew the representations by Wing and Skanska were material and that Beeche Logistics would rely thereon.

421.) Wing and Skanska represented expressly and impliedly to Beeche Logistics on multiple occasions that Beeche Logistics would be paid for the work requested by Wing as approved by Skanska under the Wing/Beeche Logistics Agreement and the above referenced fifteen change orders knowing that Beeche Logistics would rely on the representations.

422.) Wing and Skanksa knew the representations by Wing and Skanska were material and that

Beeche Logistics would rely thereon.

423.) Wing and Skanska expressly and impliedly represented when Wing requested extra work from Beeche Logistics that they would extend the performance time within which Beeche Logistics could perform its obligations.

424.) Wing and Skanksa knew the representations by Wing and Skanska were material and that Beeche Logistics would rely thereon.

425.) Beeche Logistics relied on the material representations of Wing and Skanska and provided the labor and material requested by Wing as approved by Skanska.

426.) Wing and Skanska knew when they made the material representations to Beeche Logistics that the representations were false.

427.) Wing and Skanska failed and refused to pay the claims for payment that were valid and due Beeche Logistics, failed and refused to recognize the time extensions Wing and Skanska had granted Beeche Logistics, failed and refused to pursue payments due Beeche Logistics under the CCIP, and Wing wrongfully attempted to back charge Beeche Logistics for delays.

428.) Beeche Logistics sustained damages resulting from the intentional misrepresentations and reliance in the amount of $995,377.44.

429.) Wing and Skanska are jointly and severally liable to Beeche Logistics for the damages.

**COUNT V**    (Intentional Misrepresentation - Massachusetts Law - Wing):

430.) Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.) through 374.)

431.) Under Massachusetts law, there is a cause of action for intentional misrepresentation if

"... the defendant made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and the plaintiff relied upon such representation as true and acted upon it to his damage." Barrett Assocs., Inc. v. Aronson, 346 Mass. 150, 152 (1963) quoting Kilroy v. Barron, 326 Mass. 464, 465 (1950)

432.)   Wing in Massachusetts represented to Beeche Logistics in New York that the leased equipment was insured under the CCIP program against damage while on the Project.

433.)   The representation by Wing was material.

434.)   Wing in Massachusetts represented to Beeche Logistics in New York that the leased equipment was insured under the CCIP program against damage while on the Project knowing that Beeche Logistics would rely on the representation.

435.)   Beeche Logistics relied on the representation of Wing, did not include the cost of procuring its own insurance in the Wing/Beeche Logistics Agreement, and did not procure its own insurance coverage separate and apart from the CCIP.

436.)   Wing in Massachusetts represented to Beeche Logistics in New York on multiple occasions that it would pay Beeche Logistics for the work requested by Wing under the Wing/Beeche Logistics Agreement and the above referenced fifteen change orders.

437.)   The representations by Wing were material.

438.)   Wing in Massachusetts represented to Beeche Logistics in New York on multiple occasions that it would pay Beeche Logistics for the work requested by Wing under the Wing/Beeche Logistics Agreement and the above referenced fifteen change orders knowing that Beeche Logistics would rely on the representations.

439.)   Wing in Massachusetts represented when it requested extra work from Beeche Logistics
        in New York that Wing would extend the performance time within which Beeche
        Logistics could perform its obligations.

440.)   The representations by Wing were material.

441.)   Wing in Massachusetts represented that it would extend the performance time within
        which Beeche Logistics could perform its obligations and knew that Beeche Logistics
        would rely thereon.

442.)   Wing in Massachusetts intentionally concealed from Beeche Logistics the material
        information that Wing did not post a payment or performance bond to secure payment to
        Beeche Logistics for labor and materials supplied to the Project.

443.)   Wing knew that the failure of Wing to post payment and performance bonds was material
        to Beeche Logistics.

444.)   Beeche Logistics relied on the material representations of Wing that it would pay Beeche
        Logistics for the labor and materials requested by Wing and extend the period within
        which Beeche Logistics could perform its obligations.

445.)   Beeche Logistics provided the labor and material requested by Wing.

446.)   Wing knew when it made the material representations to Beeche Logistics that the
        representations were false.

447.)   Wing in Massachusetts failed and refused to pay the claims for payment that were valid
        and due Beeche Logistics, failed and refused to recognize the time extensions Wing had
        granted Beeche Logistics, failed and refused to pursue payments due Beeche Logistics
        under the CCIP, and wrongfully attempted to back charge Beeche Logistics for delays.

448.)   Beeche Logistics sustained damages resulting from the intentional misrepresentations
and reliance in the amount of $995,377.44.

449)   Wing is liable to Beeche Logistics for actual damages and punitive damages.

**COUNT VI**   (Massachusetts G.L. c.93A - Wing/Skanska):

450.)   Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.)
through 374.)

451.)   Massachusetts General Laws c. 93A §2(a) prohibits unfair and deceptive trade practices:

> Unfair methods of competition and unfair or deceptive acts or practices in the
> conduct of any trade or commerce are hereby declared unlawful.

452.)   G.L. c.93A §11 recognizes a civil remedy for violation of §2(a) for loss of money or
property caused by the unfair or deceptive practice. Relief may include an award of
actual damages or up to three but not less than two times actual damages if the court finds
a willful or knowing violation of §2(a). A successful plaintiff is also entitled to an award
of legal fees and costs.

453.)   Wing in Massachusetts and Skanska in New York and New Jersey were jointly engaged
in an unfair and deceptive practice with regard to the administration of the Wing/Beeche
Logistics Agreement and the payment to Beeche Logistics for labor and materials
provided to the UN Project.

454.)   Wing in Massachusetts and Skanska represented to Beeche Logistics in New York that
the leased equipment was insured under the CCIP program against damage while on the
Project knowing that Beeche Logistics would rely on the material representation.

455.)   Beeche Logistics relied on the material representation of Wing and Skanska, did not
include the cost of procuring its own insurance in the Wing/Beeche Logistics Agreement,

and did not procure its own insurance coverage separate and apart from the CCIP.

456.) Wing in Massachusetts and Skanska repeatedly represented to Beeche Logistics in New York that Beeche Logistics would be paid for the work under the Wing/Beeche Agreement and the fifteen change orders requested by Wing and approved by Skanska and grant extensions to Beeche Logistics for contract performance knowing that Beeche Logistics would rely on those representations.

457.) Beeche Logistics relied on the material representation of Wing and Skanska and provided the labor and materials to Wing and Skanska that were the subject of the Wing/Beeche Agreement and the change orders thereto.

458.) Wing in Massachusetts and Skanska failed and refused in bad faith, unfairly and deceptively to obtain the approvals of the United Nations for Beeche Logistics Contract Change Proposals and Applications for Payment. In the alternative, Wing and Skanska failed to timely inform Beeche Logistics prior to performing the requested work that the United Nations refused to authorize payment for the work. This was unfair and deceptive and a knowing violation of G.L. c.93A §2(a).

459.) Wing in Massachusetts failed and refused in bad faith, unfairly and deceptively to obtain the approvals of Skanska for Beeche Logistics Contract Change Proposals and Applications for Payment. In the alternative, Wing failed to timely inform Beeche Logistics prior to performing the requested work that Skanska refused to authorize payment for the work.  This was unfair and deceptive and a knowing violation of G.L. c.93A §2(a).

460.) The repeated representations regarding insurance coverage, future payments, and

extensions were made by Wing and Skanska with the knowledge that they were not true. This was unfair and deceptive and a knowing violation of G.L. c.93A §2(a).

461.)   After Wing in Massachusetts and Skanska agreed to extend the performance dates for Beeche Logistics, Wing demanded that Beeche Logistics waive the extensions as a condition for being paid monies that were due Beeche Logistics. This was unfair and deceptive and a knowing violation of G.L. c.93A §2(a).

462.)   The leased equipment of Beeche Logistics was damaged at the Project, and the damage was covered by the CCIP. The refusal of Skanska to pay the damage claims under the CCIP was an unfair insurance practice within the meaning of G.L. c.176D.

463.)   Wing in Massachusetts and Skanska failed and refused to process the documents of Beeche Logistics necessary to obtain the insurance proceeds. This was unfair and deceptive and a knowing violation of G.L. c.93A §2(a).

464.)   Wing in Massachusetts and Skanska failed and refused to mediate the dispute with Beeche Logistics in good faith. To the extent that mediation was required, the refusal of Wing and Skanska to mediate was unfair and deceptive and a knowing violation of G.L. c.93A §2(a).

465.)   Beeche Logistics sustained actual damages caused by the unfair and deceptive acts and practices of Wing and Skanska in the amount of $995,377.44.

466.)   Beeche Logistics has incurred reasonable legal fees and costs.

467.)   Wing and Skanska are jointly and severally liable to Beeche Logistics for the actual damages, not less than twice but no more than three times actual damages, reasonable legal fees and costs.

**COUNT VII**   (Negligent Misrepresentation - New York - Wing/Skanska):

468.)   Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.) through 374.)

469.)   Under New York law, there is a cause of action for negligent misrepresentation if: there is a representation of a material fact that the defendant knew or should have known was false; a representation that the defendant knew or should have known the plaintiff would rely upon;  and a representation the plaintiff relied upon which resulted in injury. *See generally* Sykes v. RFD Third Avenue 1 Associates, LLC, 15 N.Y.3d 370, 938 N.E.2d 325 (2010).

470.)   Wing and Skanska represented to Beeche Logistics that the leased equipment was insured under the CCIP program against damage while on the Project knowing that Beeche Logistics would rely on the material representation.

471.)   Beeche Logistics relied on the material representation of Wing and Skanska, did not include the cost of procuring its own insurance in the Wing/Beeche Logistics Agreement, and did not procure its own insurance coverage separate and apart from the CCIP.

472.)   Wing and Skanska repeatedly represented to Beeche Logistics that they would pay Beeche Logistics for the work requested by Wing and approved by Skanska and extend the period within which Beeche Logistics was obligated to perform knowing that Beeche Logistics would rely on the material representations.

473.)   Beeche Logistics relied on the representations of Wing and Skanska that Beeche Logistics would be paid for the work requested by Wing and approved by Skanska.

474.)   Beeche Logistics provided the labor and material requested by Wing and approved by

Skanska.

475.)   Wing and Skanska knew or should have know when they made the representations to Beeche Logistics that Wing would pay for the work requested by Wing and approved by Skanska that the payments would not be made, the time for performance by Beeche Logistics would not be extended, and the leased property of Beeche Logistics at the Project site would not be insured under the CCIP.

476.)   Beeche Logistics sustained damages caused by the material misrepresentations and reliance thereon in the amount of $995,377.44.

477.)   Wing and Skanska are jointly and severally liable to Beeche Logistics for the damages.

**COUNT VIII** (Negligent Misrepresentation - Massachuestts - Wing):

478.)   Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.) through 374.)

479.)   Under Massachusetts law, negligent misrepresentations are misrepresentations that occur without the speaker's knowledge that the statement is false if the truth is reasonably susceptible of actual knowledge or otherwise expressed, if through a modicum of diligence, accurate facts are available to the speaker. Accusnet Federal Credit Union v. Roderick, 26 Mass.App.Ct. 604, 605 (1988).

480.)   Wing represented to Beeche Logistics that the leased equipment was insured under the CCIP program against damage while on the Project knowing that Beeche Logistics would rely on the material representation.

481.)   Beeche Logistics relied on the material representation of Wing, did not include the cost of procuring its own insurance in the Wing/Beeche Logistics Agreement, and did not

procure its own insurance coverage separate and apart from the CCIP.

482.)   Wing repeatedly represented to Beeche Logistics that it would pay Beeche Logistics for the work requested by Wing and extend the period within which Beeche Logistics was obligated to perform knowing that Beeche Logistics would rely on the material representations.

483.)   Beeche Logistics relied on the representations of Wing that it would pay Beeche Logistics for the work requested by Wing.

484.)   Beeche Logistics provided the labor and material requested by Wing.

485.)   Wing should have known when it made the representations to Beeche Logistics that Wing would pay for the work requested by Wing that the payments would not be made, the time for performance by Beeche Logistics would not be extended, and the leased property of Beeche Logistics at the Project site would not be insured under the CCIP.

486.)   In the alternative, Wing could have known with a modicum of diligence, when it made the representations to Beeche Logistics that Wing would pay for the work requested by Wing that the payments would not be made, the time for performance by Beeche Logistics would not be extended, and the leased property of Beeche Logistics at the Project site would not be insured under the CCIP.

487.)   Beeche Logistics sustained damages caused by the material misrepresentations and reliance thereon in the amount of $995,377.44.

488.)   Wing is liable to Beeche Logistics for the damages.

**COUNT IX**   (Third Party Beneficiary - Wing/Skanska):

489.)   Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.)

through 374.)

490.)   The common law of the State of New York recognizes a cause of action for breach of

contract on behalf of a third party beneficiary of that contract. *See* <u>Bild v. Konig</u>, United

States District Court, No. 09-CV-5576 (E.D.N.Y. 2011), 2011 WL 1563576.

> Under New York law, a party asserting rights as a third-party beneficiary must
> establish that "(1) a valid and binding contract existed, (2) the contract was
> intended for the plaintiff['] s benefit, and (3) the benefit to the plaintiff is
> immediate (rather than accidental), indicating that the contracting parties intended
> to compensate the plaintiff." <u>ACE Chrome Corp. v. IBEX Const., LLC</u>, No. 08
> CV 10401, 2009 WL 2482136 at 3 (S.D.N.Y. Aug. 13, 2009)

<u>Bild v. Konig</u>, *supra,* at 2

491.)   The Skanska/Wing Agreement signed by Wing and Skanska required that Wing pay

Beeche Logistics for the work reflected in the Applications for Payment submitted by

Beeche Logistics and approved by Skanska and Wing.

492.)   The Skanska/Wing Agreement required Wing to provide Skanska with a release of

claims executed by Beeche Logistics as a condition of Skanska paying Wing on the

Applications for Payment submitted by Wing.

493.)   Both requirements promoted the likelihood that Beeche Logistics would be paid by Wing

for the labor and materials provided by Beeche Logistics.

494.)   Both requirements intended to convey an immediate benefit to Beeche Logistics.

495.)   Beeche Logistics was an intended third party beneficiary of the Skanska/Wing

Agreement.

496.)   Wing breached the Skanska/Wing Agreement when it received monies under

Applications for Payment submitted by Wing to Skanska which included work performed

by Beeche Logistics but failed to pay Beeche Logistics upon receipt of the monies from Skanska.

497.)    Skanska breached the Skanska/Wing Agreement when it paid Wing for work performed by Beeche Logistics without receiving a release from Beeche Logistics.

498.)    Beeche Logistics was damaged by the breach of the express and implied covenants in the Skanska/Wing Agreement in the amount of $995,377.44.

499.)    Wing and Skanska are jointly and severally liable to Beeche Logistics for the damages.

**COUNT X**      (New York Lien Law, Art. 3A - Wing/Mulcahey):

500.)    Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.) through 374.)

501.)    Under Lien Law Art. 3A §70, all funds received or rights to receive funds by a contractor on a public or private improvement in New York under a contract to improve property constitute assets of a statutory trust for which the contractor is designated as statutory trustee. Funds paid to a contractor for work performed by subcontractors are trust funds held by the contractor for the benefit of the subcontractors and must be paid to the sub-contractors before being used by the contractor for non-project-specific expenses. The statute recognizes a cause of action of a trust beneficiary to recover trust funds

502.)    The purpose of the Trust is to obligate a contractor to pay subcontractors (among others who perform services for the project). Lien Law Art. 3A §71(2)(a)

503.)    The trust arises upon the execution of a subcontract. Lien Law Art. 3A §71(5)

504.)    If a subcontractor is not paid by a trustee within thirty one days of the date when payment is due, any application of trust assets for a purpose other than those specifically permitted

by Lien Law Art. 3A §71 is deemed a diversion of trust assets (Lien Law Art. 3A §72)

for which the trustee has absolute civil liability. Lien Law Art. 3A §79-A.

505.)   The failure of a trustee to distribute trust funds consistent with Lien Law Art. 3A §71 is

larceny punishable under New York law by imprisonment. Lien Law Art. 3A §79-A

506.)   Beeche Logistics provided the labor and material requested by Wing to the Project.

507.)   Wing was paid by Skanska for the labor and materials provided by Wing to the Project.

508.)   Wing and Mulcahey are "trustees" within the meaning of Lien Law Art. 3A.

509.)   Wing has owed Beeche Logistics $995,377.44 for more than thirty days.

510.)   Wing and Mulchahey paid salaries and administrative expenses to its employees, officers

and principals from the funds paid Wing by Skanska. The payments represented a

diversion of trust assets.

511.)   Beeche Logistics sustained damages for non-payment in the amount of $995,377.44.

512.)   The defendants Wing and Mulcahey are liable to Beeche Logistics for the damages.

**COUNT XI** (Breach of Trust - New York - Wing):

513.)   Beeche Logistics incorporates by reference the allegations contained in paragraphs 1.)

through 374.)

514.)   Section 4.5 of Exhibit E to the Skanska/Wing Agreement was incorporated by reference

within the Wing/Beeche Logistics Agreement and stated, in part:

> All funds paid to Trade Contractor in connection with the Project constitute funds held in trust by Trade Contractor. Trade Contractor agrees to apply first to the payment of : (I) non-exempt taxes owed by Trade Contractor based on labor, services, equipment, materials supplies and other items acquired, performed, furnished or used in connection with the performance of the Work; (ii) Trade Contractor bond and insurance premiums; and (iii) sub-Trade Contractors and any applicable Sub-Trade Contractor benefit funds.

515.)   Wing received more than $995,377.44 (after deductions for the payment by Wing of non-

exempt taxes and Trade Contractor bond and insurance premiums) from Skanska under

the Skanska/Wing Agreement between February 25, 2012 and the present.

516.)   Wing breached the provisions of Section 4.5 of Exhibit E to the Skanska/Wing

Agreement when it failed and refused to pay Beeche Logistics $995,377.44.

517.)   Beeche Logistics sustained damages for non-payment in the amount of $995,377.44.

518.)   Wing is liable to Beeche Logistics for the damages.

**COUNT XII**   (RICO - Wing, Skanska and Mulcahey):

519.)   Beeche Logistics incorporates by reference the allegations contained in paragraphs 1

through 374, 407 through 427, and 453 through 463.

520.)   18 U.S.C. §1962(c) provides, in part:

> It shall be unlawful for any person employed by or associated with any enterprise
> engaged in, or the activities of which affect, interstate or foreign commerce, to
> conduct or participate, directly or indirectly, in the conduct of such enterprise's
> affairs through a pattern of racketeering activity ....

521.)   18 U.S.C. §1962(d) provides, in part:

> It shall be unlawful for any person to conspire to violate any of the provisions of
> subsection ... (c) of this section.

522.)   The term "racketeering activity" includes mail and wire fraud as defined in 18 U.S.C.

§§1341 and 1343. *See* 18 U.S.C. §1961(1).

523.)   Mail fraud as defined by 18 U.S.C. §1341 includes:

> Whoever, having devised or intending to devise any scheme or artifice to defraud
> or for obtaining money or property by means of false or fraudulent pretenses,
> representations or promises... places in any post office or authorized depository
> for mail matter, any matter or thing whatever to be sent or delivered by the Postal
> Service, or deposits or causes to be deposited any matter or thing whatever to be
> sent or delivered by any private or commercial interstate carrier or takes or
> receives therefrom any such matter or thing, or knowingly causes to be delivered

by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed ....

524.)   Wire fraud as defined by 18 U.S.C. §1343 includes:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of alse or fradulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire lll communication in interstate or foreign commerce, any writings ... for the purpose of executing such scheme or artifice, .....

525.)   The misrepresentations of Wing, Skanska and Mulcahey were transmitted by both mail and wire in violation of 18 U.S.C. §§1341 and 1343.

526.)   18 U.S.C. §1964( c) provides, in part:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, ....

527.)   Skanska in New York and New Jersey and Wing and Mulcahey in Massachusetts engaged in a pattern of conduct and acted intentionally and in concert since October of 2009 to conceal from Beeche Logistics the fact that the usual and customary means for Beeche Logistics to secure payment by means of mechanics liens, payment bonds, performance bonds, payments by joint check, and/or releases to be executed by Beeche Logistics as a condition of payment to Wing were not available to Beeche Logistics to secure payment for labor and materials supplied for the UN Project.

528.)   Skanska in New York and New Jersey and Wing and Mulcahey in Massachusetts engaged in a pattern of conduct, with conscious agreement, and acted intentionally and in concert since February 25, 2010 to fraudulently induce Beeche Logistics to perform "extra" work by repeatedly promising  in New York, New Jersey, and Massachusetts, to

pay Beeche Logistics to perform such "extra" work while knowing when the promises were made to Beeche Logistics that they were untrue.

529.) Skanska, Mulcahey and Wing as "persons" separate and apart participated in the renovation of the UN Secretariat Building as a common enterprise within the meaning of 18 U.S.C. §1962(c).The structure of the common enterprise was defined by the UN/Skanska Agreement, the Skanska/Wing Agreement, and the Wing/Beeche Logistics Agreement. *See generally* <u>United States v. Castellano</u>, 610 F.Supp. 1359 (S.D.N.Y. 1985)

530.) The intentional misrepresentations of Mulcahey and Wing in Massachusetts and Skanska in New York and New Jersey to Beeche Logistics in New York evidence an agreement between Mulcahey, Wing and Skanska to participate directly and indirectly in the affairs of the common enterprise through a pattern of racketeering. *See* <u>United States v. Cervone</u>, 907 F.2d 332, 344 (2nd cir. 1990).

531.) The intentional misrepresentations were interrelated and continuous and neither sporadic nor isolated.

532.) Skanska, Mulcahey and Wing engaged in a pattern of conduct and acted intentionally and in concert since February 25, 2010 to either delay the payment of or fail to pay all twenty-five Applications for Payment submitted on behalf of Beeche Logistics over a period of more than two years. The failure and refusal to pay is continuing. *See generally* <u>H.J. Inc. v. Northwestern Bell Telephone Co.</u>, 109 S.Ct. 2893, 2902 (1989)

533.) Skanska, Mulcahey and Wing engaged in a pattern of conduct and acted intentionally and in concert since February 25, 2010 to either delay the payment of or fail to pay fifteen change orders for extra work beyond the work described in the original Wing/Beeche

Logistics Agreement. These change orders required the payment to Beeche Logistics of additional compensation beyond that required in the original Wing/Beeche Logistics Agreement. The refusal and failure to pay is continuing.

534.) The motives of Skanska, Mulcahey and Wing to misrepresent the intentions of Skanska, Mulcahey and Wing to pay Beeche Logistics for extra work were clear: Skanska guaranteed to the United Nations that it would complete the work described in the UN/Skanska Agreement for a fixed price. Wing contracted with Skanska to provide its services to Skanska under the Skanska/Wing Agreement at a fixed price.

535.) In the event that Skanska and/or Wing failed to perform their contractual obligations, each was subject to penalties and/or damage claims.

536.) The United Nations failed and refused to increase the amount to be paid to Skanska under the UN/Skanska Agreement for extra work provided by Beeche Logistics.

537.) Skanska and Wing needed Beeche Logistics to provide extra labor and materials outside of the terms of the Wing/Beeche Logistics Agreement despite the absence of the agreement of the United Nations to increase the amount to be paid to Skanska, Wing and Beeche Logistics for the extra labor and materials provided by Beeche Logistics.

538.) Each of the fraudulent misrepresentations of Skanska, Mulcahey and Wing were memorialized in writing and transmitted interstate by email, United States mail and/or private interstate carrier among the plaintiff and defendants in New Jersey, New York and Massachusetts.

539.) Each of the fraudulent misrepresentations of Skanska and Wing embraced "the same or similar purposes, results, participants, victim(s) and method of commission." United

States v. Indelicato, 865 F.2d 1370,1382 (2nd Cir. 1989)

540.)   Each of the intentional misrepresentations and/or intentional concealments by Skanska, Mulcahey and Wing were overt acts in furtherance of a common enterprise and were predicate acts within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq.*

541.)   The predicate acts of the defendants Wing, Mulcahey and Skanska caused the damages sustained by Beeche Logistics. Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2nd Cir. 1990)

542.)   Beeche Logistics sustained damages for non-payment in the amount of $995,377.44.

543.)   Skanska, Mulcahey and Wing violated 18 U.S.C. §1962 and are liable, jointly and severally, to Beeche Logistics for  actual damages, multiple damages, attorneys fees and costs.

**WHEREFORE**, the plaintiff Greg Beeche Logistics, LLC prays for Judgment, as may be appropriate under each Count, against the defendants Skanska USA Building, Inc., Wing, Inc. Specialty Trades, and Robert Mulcahey, jointly and severally, for the following relief:

a.)   For an award of compensatory damages under Counts I through XII;

b.)   For an award of not less than twice but no more than three times compensatory damages under Count VI;

c.)   For an award of three times compensatory damages under Count XII;

d.)   For an award of punitive damages under Count V;

e.)   For an award of attorneys fees and expenses under Counts VI and XII;

f.)   For an award of prejudgment interest;

g.)     For an award of costs; and

h.)     For any such further relief as justice and equity may require.

## VERIFICATION

I, Kirk Beeche, hereby declare under penalty of perjury that the foregoing is true and

correct. Executed on June 22, 2012.

_____
Kirk Beeche
Member and Director of
Greg Beeche Logistics, LLC

## DEMAND FOR JURY TRIAL

Greg Beeche Logistics, LLC hereby demands a trial by jury on all counts where a jury

trial is available.

Greg Beeche Logistics, LLC

By its attorneys:

/s/ Robert S. Wolfe
Robert S. Wolfe, Esq.
BBO# 532500
Robert Wolfe Associates, P.C.
7 Kimball Lane, Building B
Lynnfield, Ma. 01940
(781) 246-4545 Tel.

RWAssociates@Prodigy.net
June 22, 2012