UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GREG BEECHE LOGISTICS, LLC,<br><br>    Plaintiff<br><br>    v.<br><br>SKANSKA USA BUILDING, INC.,<br>WING INC. SPECIALTY TRADES and<br>RON MULCAHEY,<br><br>    Defendants. | Civil Action No. 12-cv-11121-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                         September 2, 2015

### I.     Introduction

Plaintiff Greg Beeche Logistics, LLC ("Beeche") brings this action against Defendants Skanska USA Building, Inc. ("Skanska"), Wing Inc. Specialty Trades ("Wing") and Ron Mulcahey ("Mulcahey"), Wing's president, for breach of contract and equitable claims under New York law over a construction project in New York City.  Skanska has moved for summary judgment.  D. 151.  For the reasons stated below, the Court ALLOWS Skanska's summary judgment motion.

### II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute on any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless

Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences" in her favor. Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

**III.    Factual Background**

The following facts are drawn from Skanska's statement of material facts, D. 154, Beeche's responses and supplementary statement of material facts, D. 161, Skanska's responses to Beeche's supplementary statement of material facts, D. 232, and Skanska's statement of material facts consolidated with Beeche's responses, D. 233.[1]

Skanska is a provider of construction services. D. 233 ¶ 2. Wing is an asbestos contractor. Id. ¶ 10. Beeche designs scaffolding systems for external work on outside surfaces of high rise buildings in New York City. Id. ¶ 6.

In July 2007, Skanska entered into a Preconstruction Services Agreement in which it agreed to preform preconstruction services for the renovation and refurbishment of the United Nations' ("UN") headquarters complex in New York City ("Project"). Id. ¶ 7. In 2008, a potential Project demolition contractor brought Greg Beeche, the founder of Beeche, to a pre-bid

---

[1] The Court ALLOWS *nunc pro tunc* Beeche's motions related to filing missing exhibits, D. 230, 231, 234.

meeting with Skanska to discuss scaffolding systems. Id. ¶¶ 6, 9. Following that meeting, Beeche spoke with other contractors, including Wing. Id. ¶ 10. In January 2009, Skanska invited potential contractors for a pre-bid meeting, which Beeche attended as a potential subcontractor. Id. ¶¶ 13, 14.

Two months later, in March 2009, Skanska and the UN entered into a construction management agreement with a guaranteed maximum price ("UN/Skanska Agreement") in which Skanska agreed to be the Project's construction manager. Id. ¶ 26. The UN/Skanska Agreement provided that Skanska "shall be considered as having the legal status of an independent contractor vis-à-vis the [UN]" and that Skanska's personnel and contractors "shall not be considered in any respect as being employees or agents of the [UN]." Id. ¶ 28. The UN/Skanska Agreement also contained a provision stipulating that "[t]his Agreement is for the exclusive benefit of the parties hereto, and no provision contained herein is for the benefit of or may be relied upon or enforced by any third party." Id. ¶ 29.

Around October 2009, Skanska and Wing entered into an agreement in which Wing agreed to be a Project contractor ("Skanska/Wing Agreement"). Id. ¶ 33. The Skanska/Wing Agreement provided that "neither [itself] nor any subcontract with a Sub-Trade Contractor shall create any contractual relationship between any Sub-Contractor and either [the UN] or [Skanska] . . . to any Sub-Trade Contractor." Id. ¶ 36. Additionally, Wing "assumed toward [Skanska] and the [UN] all the obligations that [Skanska] assumes toward the [UN] in the [UN/Skanska Agreement] with respect to the Work to be performed by [Wing] under the [Skanska/Wing Agreement]." Id. ¶ 35.

In February 2010, Beeche entered into an agreement with Wing to be its subcontractor to provide scaffolding services for the Project for $5 million ("Wing/Beeche Agreement."). Id. ¶

58. The Wing/Beeche Agreement stated that the Skanska/Wing Agreement was "fully a part" of the contract "as if attached to [itself] or repeated herein." Id. ¶ 55. The Wing/Beeche Agreement "represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral." Id. The Wing/Beeche Agreement "shall not be construed to create a contractual relationship of any kind (1) between the Architect and [Beeche], (2) between [Skanska] and [Beeche], or (3) between any persons or entities other than [Wing] and [Beeche]." Id. ¶ 62. Finally, "[Wing] and [Beeche] shall be mutually bound by the terms of this Agreement and, to the extent that the provisions . . . of the [Skanska/Wing Agreement] apply to the Work of the Subcontractor, [Wing] shall assume toward [Beeche] all obligations and responsibilities that [Skanska], under such documents, assumes toward the [Wing], and [Beeche] shall assume toward [Wing] all obligations and responsibilities which [Wing], under such documents, assumes toward [Skanska]." Id. ¶ 64.

The Wing/Beeche Agreement included a mechanism for the parties to change the scope of the work. Beeche "may be ordered in writing by [Wing], without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions, or other revisions." Id. ¶ 65. Beeche, "prior to the commencement of such changed or revised Work, shall submit promptly to the [Wing] written copies of a claim for adjustment to the Subcontract Sum and Subcontract for such revised Work in a manner consistent with requirements of the [Wing/Beeche Agreement]." Id.

At his deposition, Greg Beeche testified that when Beeche submitted change order requests, it submitted them to Wing. Id. ¶ 71. Written approvals of change orders were also through Wing, although as discussed further below, Beeche contends Skanska promised to pay Beeche directly twice, on May 27 and June 7 in 2011. Id. ¶ 72. Payments to Beeche, which

4

were wire transfers, always came from Wing. Id. ¶ 73.

Sometime in 2011, Beeche refused to move equipment related to the Project because it asserted it was entitled to payment for costs previously incurred. Id. ¶ 77. Dan Kolakowski ("Kolakowski"), a Skanska senior vice president on the project, D. 232 ¶ 1A, held a meeting with Wing and Beeche representatives to discuss this matter, D. 233 ¶ 79. After the meeting, on May 27, 2011, Kolakowski sent Beeche an email that stated: "Roof Attachments: Skanska has agreed to pay GBL $120,816 for the additional work associated with this method of attaching to the roof." Id. ¶ 78. Beeche submitted its request for payment to Wing and Wing paid most of it. Id. ¶ 85. With Wing in default and under criminal investigation, D. 232 ¶ 4A, Beeche now seeks the balance from Skanska, D. 233 ¶¶ 85-86.

On June 7, 2011, Kolakowski wrote to Beeche: "This is to advise that Skanska and Wing agree to pay Greg Beeche Logistics $116,375 for the required additional seven quadrant moves." Id. ¶ 82. Beeche submitted a request for payment to Wing and Wing paid a portion of it. Id. ¶¶ 90-91. Beeche now seeks the remainder from Skanska. Id. ¶ 91.

## IV.   Procedural History

On June 22, 2012, Beeche filed a twelve-count complaint against Skanska, Wing and Mulcahey. D. 1. On September 5, 2012, Beeche sought a notice of default as to Wing and Mulcahey, which the Court entered on October 11, 2012. D. 13; D. 15.

On October 30, 2012, Beeche moved for an order for a trustee process attaching the monies and credits of Wing in Skanska's possession and an order approving an attachment of certain assets of Mulcahey. D. 17; D. 18. Two days later, Skanska moved to dismiss all claims against it in Beeche's complaint: Count I (breach of contract), Count II (unjust enrichment), Count III (promissory estoppel), Count IV (intentional misrepresentation), Count VI (Mass. Gen.

5

L. c. 93A claim), Count VII (negligent misrepresentation), Count IX (third-party beneficiary liability) and Count XII (RICO claim).  D. 21.

On June 19, 2013, the Court (Boal, Ch. M.J.) held a hearing on the motions.  D. 42.  The magistrate judge issued two separate Report and Recommendations ("R&Rs"), one on Skanska's motion to dismiss, D. 48, and another on Beeche's motions, D. 49.  On Skanska's motion, the first R&R recommended that the Court grant Skanska's motion to dismiss on seven of the eight counts.  D. 48 at 28.  On the sole count to survive, Count I (breach of contract), the R&R recommended that the Court dismiss the claim except as it related to two alleged promises by Skanska to pay for certain work: (1) an alleged "May 27, 2011 agreement to pay for additional work on roof attachments" and (2) an alleged "June 7, 2011 agreement to pay for quadrant moves."  Id. at 23.  On Beeche's motions, the second R&R recommended that the Court deny Beeche's motion for a trustee process, but grant in part and deny in part its motion for attachment.  D. 49 at 1.

On September 23, 2013, the Court adopted and accepted in part the two R&Rs.  D. 72.  As to Beeche's motion for attachment, the Court accepted the R&R.  Id. at 6.  On Beeche's motion for a trustee process, the Court denied the motion without prejudice and allowed Beeche to file a motion for reconsideration because it introduced new evidence that was not before Chief Magistrate Judge Boal.  Id. at 8.  On Skanska's motion to dismiss, the Court adopted the recommendation to dismiss Counts VI and XII with prejudice.  Id. at 9.  Because Beeche sought leave to file an amended complaint since the R&R, the Court dismissed without prejudice "Counts III, IV, VII and IX and the portion of Court I (other than the claim for certain extra work)."

On October 1, 2013, Beeche moved for reconsideration on its trustee process motion.  D.

6

73. On October 10, 2013, Beeche filed an amended complaint. D. 75. On November 12, 2013, Skanska moved to strike or dismiss Beeche's amended complaint. D. 87. After a hearing on both motions, D. 99, on May 19, 2014, Chief Magistrate Boal again issued two R&Rs. D. 100, D. 101.

On August 8, 2014, the Court adopted the R&R to strike Beeche's amended Complaint for its failure to comply with Fed. R. Civ. P. 8(a)(2). D. 112. It also explained that "[g]iven the Court's September 23, 2013 Order, the only claims [in the original complaint] that survived were the portion of Count I (breach of contract) that related to Skanska's promise to pay for certain work and Count II (unjust enrichment)." Id. The Court allowed Beeche until August 25 to file a second amended complaint "that includes Count I (breach of contract only as it relates to Skanska's promise to pay for certain work), Count II (unjust enrichment) and a claim for promissory estoppel." Id. The Court denied "leave to amend to add any of the other claims." Id. The Court also separately adopted the R&R denying Beeche's motion for reconsideration. D. 111.

On August 21, 2014, Beeche filed its second amended complaint. D. 113. On September 3, 2014, Skanska moved to strike the complaint and enter judgment in its favor, D. 114, but the Court denied its motion and allowed the case to proceed through discovery. D. 119. On June 11, 2015, Skanska filed for summary judgment. D. 151. The Court heard the parties on August 12, 2015 and took the matter under advisement. D. 259.

## V.     Discussion

### A.     No Genuine Issue of Material Fact Exists for the Breach of Contract Claim

To recover for breach of contract under New York law, a plaintiff must prove (1) the existence of a contract between the parties; (2) performance of the plaintiff's obligations under

the contract; (3) breach by the defendant; and (4) damages caused by the defendant's breach.[2] Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011). Here, the Court has twice limited Beeche's breach of contract claim to alleged Skanska promises on May 27, 2011 and June 7, 2011 to pay Beeche for certain additional work. As previously ruled, Beeche's attempt to seek payment for fifteen change orders for the Project failed as a matter of law because Skanska was not a party to the Wing/Beeche Agreement and Beeche always submitted these orders for payment to Wing, not Skanska, consistent with the Wing/Beeche Agreement's provisions. D. 48 at 22-24; D. 72 at 4-5. After Beeche's amended its complaint as to this claim, the Court struck the complaint and reiterated that the breach of contract claim could be re-pleaded "only as it relates to Skanska's promise to pay for certain work." D. 112.

Despite the Court's rulings on this issue, Beeche continues to allege that Skanska faces breach of contract liability because "Skanska breached the express and implied covenants attendant to the fifteen change orders between Wing and Beeche." D. 113 ¶ 188. Because the Court has already limited Beeche's breach of contract claim to only the May 2011 and June 2011 Skanska promises, Beeche's allegations of other grounds for contract liability will not be addressed at length here. The Court notes, however, that the Skanska/Wing Agreement expressly provides that it and any subcontract does not create a contractual relationship between a subcontractor like Beeche and Skanska. D. 233 ¶ 36. Similarly, the Wing/Beeche Agreement provides that it "shall not be construed to create a contract of any kind" between Skanska and Beeche. Id. ¶ 62. Moreover, the Wing/Beeche Agreement incorporates both the Skanska/Wing Agreement and the UN/Skanska Agreement, which contains an explicit provision barring third-party beneficiaries and agency relationships. Id. ¶¶ 28, 29, 35, 64.

---

[2] The parties agree and the Court has previously ruled that New York law applies to all three remaining claims. D. 233 ¶ 61; D. 48 at 9 n.5; D. 72.

8

These provisions, typical in construction arrangements, are regularly enforced by New York courts. See, e.g., Superb Gen. Contracting Co. v. City of New York, 893 N.Y.S.2d 866, 867 (App. Div. 2010) (granting summary judgment against subcontractor because the "incorporated prime contract specifically provided that the construction manager was an independent contractor and not an agent or representative of the City"); Kaback Enterprises, Inc. v. Time, Inc., 813 N.Y.S.2d 54, 55 (App. Div. 2006) (concluding that subcontractor's claim was "barred by various provisions of the construction management agreement incorporated by reference in plaintiff's subcontract and bid documents, which expressly preclude actions by third parties, including subcontractors"); Schuler-Haas Elec. Corp. v. Wager Const. Corp., 395 N.Y.S.2d 272, 274 (App. Div. 1977) (dismissing subcontractor's claim for extra work "[i]n view of the contract's language" barring the subcontractor from claiming to be a third-party beneficiary or having any contractual right against the owner). Not surprisingly, because of these provisions and the mechanism for change orders in the Wing/Beeche Agreement (to which Skanska was never a party), Beeche always sought payment from Wing for change orders. D. 233 ¶¶ 65, 71-74.

As for the portion of Beeche's breach of contract claim based on the alleged promises made by Skanska on May 27, 2011 and June 7, 2011, the Court concludes that Beeche cannot recover on either promise. Despite the length and scope of litigation of this matter, as Skanska contends, the legal issue is not as complex as Beeche argues. New York law specifically provides that "a subcontractor cannot bring claims based on breach of contract against the owner or against the general contractor absent privity of contract." USA Bridge Const. of N.Y. v. Nat'l R.R. Passenger Corp. (Amtrak), No. 98-cv-7713-JG, 1999 WL 718078, at *3 (E.D.N.Y. Aug. 30, 1999) (citations omitted). "[A] narrow exception" to this general rule, however, does exist. In re

Cavalry Constr., Inc., No. 07-cv-22707-RDD, 2013 WL 5682741, at *3 (Bankr. S.D.N.Y. Oct. 18, 2013). In certain cases, "'the functional equivalent of privity' may be established despite the lack of a formal contract" when an owner and subcontractor engage more directly. RLI Ins. Co. v. King Sha Grp., 598 F. Supp. 2d 438, 443 (S.D.N.Y. 2009) (citation omitted).

Some New York courts have concluded that this exception is intended for parties who sue "downstream," i.e., owners or general contractors who sue subcontractors, not the other way around. See Brownell Steel, Inc. v. Great Am. Ins. Co., 813 N.Y.S.2d 550, 551 (App. Div. 2006) (holding that surety could assert general contractor's claim against subcontractor because the chain of agreements from the general contractor down to the subcontractor provided the functional equivalent of privity, but noting that "[c]onversely, a subcontractor is not normally a third-party beneficiary of the contract between the owner and the general contractor and, for this reason, a liquidating agreement is required to remedy the lack of privity which otherwise precludes a subcontractor from suing the owner"); R.H. Sanbar Projects, Inc. v. Gruzen P'ship, 538 N.Y.S.2d 532, 534 (App. Div. 1989) (concluding that cases barring subcontractors from suing owners for payment based on an agreement between the owner and the general contractor are "inapposite" because "[h]ere, to the contrary, it is the owner claiming to be a third-party beneficiary").

Nevertheless, courts that have concluded a subcontractor's contractual claim to be potentially viable have hinged on allegations that the owner agreed to pay the subcontractor. Robert H. Finke & Sons Inc. v. Sears Oil Co. Inc., 681 N.Y.S.2d 829, 830 (App. Div. 1998) (holding that question of fact existed for breach of contract claim where the owner allegedly agreed to pay for subcontractor's services and never disputed the invoices that the subcontractor had sent); AMEC Constr. Mgt., Inc. v City of New York, No. 604391-2004, 2012 N.Y. Misc.

LEXIS 130, at *6 (Sup. Ct. Jan. 10, 2012) (denying motion to dismiss subcontractor's claim because the subcontractor alleged that the defendant promised to pay for its services). In the absence of a promise to pay, however, evidence only that the subcontractor and the defendant worked directly or that the defendant accepted the subcontractor's work are not enough to create contractual privity. Sky-Lift Corp. v. Flour City Architectural Metals, Inc., 748 N.Y.S.2d 725, 725-26 (App. Div. 2002) (dismissing the subcontractor's claim because "[n]o basis exists for departing from the general rule that a secondary subcontractor (plaintiff) who is not paid by its primary subcontractor (defendant Frame) cannot look for payment to the contractor with whom the primary subcontractor contracted (defendant-respondent Flour City), absent privity of contract . . . or an agreement by the contractor, express or implied, to pay its subcontractor's obligations") (citations omitted); Data Elec. Co. v. Nab Const. Corp., 383 N.Y.S.2d 14, 15-16 (App. Div. 1976) (dismissing subcontractor's claim against owner where contract provided no third-party rights were created, even though subcontractor alleged that the owner "supervised and directed [its] work in all phases" and that they "dealt directly," because "[t]hese experienced business litigants should be held to their agreements").

Here, at some point in 2011, Beeche refused to move equipment until the parties resolved some issues to Beeche's satisfaction. D. 233 ¶ 77. On May 27, 2011, after a meeting to discuss Beeche's concerns, Kolakowski emailed Beeche: "Skanska has agreed to pay GBL $120,816 for the additional work associated with this method of attaching to the roof." Id. ¶ 78. Greg Beeche testified that other than this email, he is not aware of "any other document or promise or agreement by Skanska" to pay for this work because Beeche "never got substantiation one way or another on these things, other than the verbal orders." Id. ¶ 83.

But instead of submitting the request for payment to Skanska for this extra work, Beeche

11

submitted it to Wing, who paid most of it. Id. ¶ 85. That act was consistent with the Wing/Beeche Agreement as well as Beeche's own past practice, because the Wing/Beeche Agreement directed Beeche to Wing for any payment for extra work. Thus, Beeche's conduct was contrary to what Beeche now insists was the parties' agreement.

Skanska also disavows making a direct promise. At his deposition, Kolakowski testified that he did not intend to convey that Skanska would be making a payment directly to Beeche. Id. ¶ 81. Instead, he was summarizing "who was going to be the recipient of those funds and who was going to be the source of the funds, but . . . [without] changing the contract terms as to how that payment woul[d] be executed." Id.; D. 156-30 at 19.

Moreover, "[u]nder New York contract law, the fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties." Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 372 (2d Cir. 2003) (quoting Schurr v. Austin Galleries of Ill., 719 F.2d 571, 576 (2d Cir. 1983)). Without a meeting of the minds, "there is no contract." Id. (quoting Schurr, 719 F.2d at 756). On this record, the Court concludes that a factfinder cannot reasonably find that Skanska and Beeche came to a meeting of the minds that the terms of the Wing/Beeche Agreement—which barred a contractual relationship between Skanska and Beeche—no longer applied and Skanska was obligated to pay Beeche for this extra work directly.

Beeche's claim for breach of contract based on the June 11, 2011 promise fails for the same reasons. On June 7, 2011, Kolakowski wrote to Beeche: "This is to advise that Skanska and Wing agree to pay Greg Beeche Logistics $116,375 for the required additional seven quadrant moves." D. 233 ¶ 82. Kolakowski, however, testified that it was never his intention that Skanska would pay Beeche directly because Skanska "[doesn't] make payments to trade subcontractors unless a two-party check agreement is in place." D. 233 ¶ 82. Although Beeche

12

now claims otherwise, Beeche once again submitted its request for payment to Wing. Id. ¶¶ 90-91. Tellingly, this alleged promise on June 11, 2011 followed closely on the heels of the alleged promise on May 27, 2011 yet Beeche never departed from its usual conduct. The undisputed record does not reflect a meeting of the minds between Beeche and Skanska as to these payments. Beeche's breach of contract claim must be dismissed.

### B. No Genuine Issue of Material Fact Exists for Unjust Enrichment

To prove an unjust enrichment claim under New York law, Beeche must show that "(1) [Skanska] was enriched, (2) at [Beeche's] expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004). New York courts, however, have held that an express agreement on the issue in dispute bars an unjust enrichment claim "even where 'the party seeking to dismiss the claim is not a party to the contract.'" LaRoss Partners, LLC v. Contact 911 Inc., 874 F. Supp. 2d 147, 165 (E.D.N.Y. 2012) (citing Teachers Ins. & Annuity Ass'n of Am. v. CRIIMI MAE Servs. Ltd. P'ship, 681 F. Supp. 2d 501, 511 (S.D.N.Y. 2010)); see Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009) (holding that "a quasi-contractual claim against a third party must be dismissed when an undisputedly valid and enforceable written contract governs the same subject matter" and that the contrary view "has decidedly fallen out of favor"); Am. Med. Ass'n v. United Healthcare Corp., No. 00-cv-2800-LMM, 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007) (distinguishing Seiden case, cited below, and noting that "subsequent decisions both in New York state courts and in this district have consistently held that claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract"); Bellino Schwartz Padob Adver.,

Inc. v. Solaris Mktg. Grp., Inc., 635 N.Y.S.2d 587, 588 (App. Div. 1995) (affirming dismissal of unjust enrichment claim because "[t]he existence of an express contract between Solaris and plaintiff governing the subject matter of the plaintiff's claim also bars any quasi-contractual claims against defendant Titan, as a third party nonsignatory to the valid and enforceable contract between those parties"); A & V 425 LLC Contracting Co. v. RFD 55th St. LLC, 830 N.Y.S.2d 637, 645 (Sup. Ct. 2007) (stating that the "prohibition against quasi-contractual claims in the face of a written contract applies not only to the parties that are in privity of contract, but also to non-contracting parties as well" . . . . and "[t]his is especially true where, as here, a subcontractor has attempted to sue an owner when privity does not exist") (citations omitted); but see Seiden Associates, Inc. v. ANC Holdings, Inc., 754 F. Supp. 37, 40 (S.D.N.Y. 1991) (stating that "the mere existence of a written contract governing the same subject matter does not preclude such recovery from non parties so long as the other requirements for quasi contracts are met").

New York courts have applied this principle in construction cases. In Spectrum Painting Contractors, Inc. v. Kreisler Borg Florman General Construction Co., 883 N.Y.S.2d 262, 272 (App. Div. 2009), plaintiff trade contractors brought unjust enrichment claims against the owner. The court granted summary judgment for the owner because "the existence of their contracts with [the construction manager] governing the same subject matter precludes recovery." Id. In Metropolitan Electric Manufacturing Co. v. Herbert Construction Co., 583 N.Y.S.2d 497, 498 (App. Div. 1992), a manufacturer that had supplied goods to a subcontractor sued the owners and the general contractor for unjust enrichment when the subcontractor refused to pay. The court dismissed the claim. Id. The "express contract between the [manufacturer] and [the subcontractor] governing the particular subject matter of its claim for unjust enrichment

14

precludes the [manufacturer] from maintaining a cause of action sounding in quasi contract against [the general contractor] or the owners." Id. Finally, in USA Bridge, a subcontractor claimed that the general contractor instructed it to perform work outside the scope of its contract with the contractor. 1999 WL 718078, at *5. To recoup its losses for that extra work, the subcontractor sued the general contractor for unjust enrichment. Id. The court granted summary judgment for the general contractor because "[u]nder New York law," the subcontractor's contract with the contractor "govern[ed] the particular subject matter" of the unjust enrichment claim and therefore "preclude[d] it." Id. (citations and internal quotation marks omitted). The court stressed that this principle applied "whether the contract is one between parties to the action, or where one party to the action is not a party to the contract, as in this case." Id.

Here, the Wing/Beeche Agreement governs disputes over payments for extra work, the very subject matter of Beeche's unjust enrichment claim. Accordingly, even though Skanska is not a party to the Wing/Beeche Agreement, that contract bars Beeche's unjust enrichment claim. See, e.g., USA Bridge, 1999 WL 718078, at *5; Metro. Elec., 583 N.Y.S.2d at 498; Spectrum Painting, 883 N.Y.S.2d at 272.

Beeche's unjust enrichment fails for a separate reason. Apart from holding that an express agreement bars an unjust enrichment claim against a non-signatory, New York courts have also held that a subcontractor cannot maintain an unjust enrichment claim if the defendant does not obligate itself to the subcontractor. In Perma Pave Contracting Corp. v. Paerdegat Boat & Racquet Club, Inc., 549 N.Y.S.2d 57, 58 (App. Div. 1989), a subcontractor brought breach of contract and unjust enrichment claims against the owner after the general contractor refused to pay the subcontractor. The court first dismissed the contract claim for lack of privity between the subcontractor and the owner. Id. The court then concluded that "a similar result" on the

unjust enrichment claim was required because "it is a firmly established principle that a property owner who contracts with a general contractor does not become liable to a subcontractor on a quasi-contract theory unless it expressly consents to pay." Id. at 59. "The owner's mere consent to and acceptance of improvements placed on his property by the subcontractor, without more, does not render it liable to the subcontractor." Id.; see Graystone Materials Inc. v. Pyramid Champlain Co., 604 N.Y.S.2d 295, 296 (App. Div. 1993) (dismissing unjust enrichment claim because "[a]bsent evidence that [the owner] consented to pay, or by its actions assumed the obligation to pay, for [the subcontractor's] performance," the subcontractor's "sole remedy" was against the contractor).

Similarly, in Metropolitan Electric and USA Bridge, two of the cases discussed above, the courts also rejected the unjust enrichment claims because the defendants had not taken on an obligation toward the plaintiffs. In Metropolitan Electric, the court dismissed the claim because the plaintiff manufacturer's "pleadings fail to allege, and there is nothing in the record to establish, that [the general contractor] or the owners were in privity of contract with [subcontractor], or that they, by their actions, assumed an obligation to pay for the goods ordered by [the subcontractor]." 583 N.Y.S.2d at 498. The manufacturer's "sole remedy" was against the subcontractor who never paid. Id.

In USA Bridge, the court noted that the subcontractor had contracted only with the contractor. 1999 WL 718078, at *3. Accordingly, "[a]bsent evidence that [the general contractor] consented to pay, or by its actions assumed the obligation to pay," the subcontractor could recover only from the contractor. Id. The subcontractor, however, argued that the general contractor had assumed an obligation to pay because it directed the subcontractor's actions on a daily basis, the contractor never worked on the site, and the subcontractor received directions

16

only from the general contractor. The court rejected these facts as immaterial. Id. at *4. Summary judgment was appropriate because "[a]t no point" did the subcontractor or the contractor "repudiate or modify their agreement." Id. Summary judgment was also appropriate because the subcontractor "provided no evidence, through correspondence or otherwise, that suggest[ed] [the general contractor] intended to pay" for the subcontractor's services. Id.

Finally, Tibbetts Contracting Corp. v. O & E Contracting Co., 206 N.E.2d 340 (N.Y. 1965) is also instructive. In Tibbetts, O & E, a contractor, agreed to do excavation work for Vioe on one of Vioe's properties. Id. at 341. O & E then hired Tibbetts as a subcontractor. Id. At some point, a dispute arose and Vioe terminated its contract with O & E. Id. at 342. Tibbetts continued to work on the project and Vioe allegedly "fostered and promoted" its work. Id. at 342. Nevertheless, the New York Court of Appeals rejected Tibbetts' unjust enrichment claim and concluded "[n]o contract" between Vioe and Tibbetts "could be implied in fact" because the subcontractor continued to bill O & E, Vioe disclaimed any contractual relationship with Tibbetts, and O & E and Tibbetts "never repudiated, terminated or modified" their subcontractor-contractor agreement. Id. at 343-44.

Here, by virtue of the Wing/Beeche Agreement, Wing was the only party obligated to pay for Beeche's services. In accordance with that agreement, Beeche turned to Wing and never sought payment from Skanska directly, even when Skanska allegedly promised twice in 2011 that it would do so. On this record, Beeche's unjust enrichment claim fails because a factfinder cannot reasonably conclude that Wing and Beeche had repudiated their agreement or that Skanska undertook an obligation to pay Beeche directly. USA Bridge, 1999 WL 718078, at *3; Tibbetts, 206 N.E.2d at 343-44; Metro. Elec., 583 N.Y.S.2d at 498.

### C. No Genuine Issue of Material Fact Exists for Promissory Estoppel

Under New York law, Beeche must prove three elements for a claim for promissory estoppel: (1) "a clear and unambiguous promise"; (2) "reasonable and foreseeable reliance on that promise"; and (3) "injury to the relying party as a result of the reliance." Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000). Here, Beeche bases this claim on four alleged Skanska promises: (1) a promise to issue joint checks (payable to both Beeche and Wing) for Beeche's work; (2) a promise to pay Beeche "in any case" if Wing fails to pay Beeche; (3) a promise to pay for insurance claims; and (4) a promise to pay for the fifteen change orders. D. 113 ¶¶ 204-13. None of these promises can survive summary judgment.

First, it is undisputed that Beeche never relied upon Skanska's alleged promise to issue joint checks because Beeche never requested them. Both Greg Beeche and his son, who serves as the director of their company, D. 156-24 at 3, testified that they never requested Skanska to issue joint checks, D. 233 ¶¶ 105-108. Beeche never requested that Skanska issue joint checks because it wanted to maintain good relations with Wing. Id. ¶ 22. Because Beeche cannot establish it relied on that promise, the claim on this basis must be dismissed. Randolph Equities, LLC v. Carbon Capital, Inc., 648 F. Supp. 2d 507, 524 (S.D.N.Y. 2009) (noting that failure to establish reliance was fatal to promissory estoppel claim).

Second, Skanska's alleged promise to pay Beeche "in any case" was not clear and unambiguous. Although Greg Beeche testified that Kolakowski "assured [him] that we would be covered," D. 233 ¶ 15, he also testified that Kolakowski later "clarified he didn't guarantee it," Id. ¶ 25. At his own deposition, Kolakowski testified that he never assured Beeche that Skanska would pay the company if Wing did not. Id. ¶ 21. That promise "would [have] be[en] impossible for [him] to make," contrary to both his industry experience and Skanska policy. Id. On this record, the Court concludes no reasonable factfinder could find that Skanska's alleged

promise was clear and unambiguous.

Finally, the promissory estoppel claim relies upon alleged promises about change orders, including but not limited to the two orders that Beeche asserts was covered by insurance, D. 113 ¶¶ 118-25, 134-46; D. 233 ¶¶ 98-99. The Wing/Beeche Agreement, however, expressly provided that Wing, not Skanska, was the party responsible for paying change orders. D. 233 ¶¶ 64-65. Here, a factfinder cannot reasonably conclude that Beeche relied on any alleged Skanska promise to pay Beeche directly for the change orders because Beeche consistently sought and received payment from Wing, not Skanska. Id. ¶¶ 71-74. To the extent Beeche's promissory estoppel claim is based on the alleged May 27, 2011 and June 7, 2011 promises, they fail for the same reason, as Beeche never sought payment from Skanska for those promises too. Id.

## VI.  CONCLUSION

For the foregoing reasons, the Court ALLOWS Skanska's motion for summary judgment, D. 151.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge